SEWALL AND DAY CORDAGE COMPANY vs. BOSTON WATER
POWER COMPANY & others.

DAVIS JOHNSON & others vs. SAME.

GEORGE BROOKS vs. SAME.

Suffolk.   March 9, 12, 1888. — May 5, 1888.

Present : MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Flats — Boundary — Low-water Mark — Accretion — Eminent Domain —
Adverse Possession.*

The title of an owner of upland in adjoining flats extends, under the Colony ordi-
nance of 1647, where the tide ebbs and flows less than one hundred rods, to
extreme low-water mark.

A writ of entry was brought in 1884.  The demandant's predecessor in title had
owned flats bounded upon a tidal stream, an arm of the full basin of the Boston
Back Bay, which was a mere thread at extreme low water, and the tenant, who
was the grantee of the right of the Commonwealth in the flats and channels of
the full basin, claimed so much of the demanded premises as lay below mean
low-water mark under the ordinance of 1647, and the rest by accretion.  In 1820
the Mill Dam was built under a charter, flooded the premises at will, and caused
the channel below the premises and above the dam to fill up so that a part of
them was kept constantly under water, but no part was changed otherwise, and
the sediment in the channel would not have kept back the water without the
Mill Dam.  *Held,* that the demandant owned to the thread of the stream, and
that the tenant had no title by accretion or otherwise.

THREE WRITS OF ENTRY, dated June 14, 1884, to recover
adjacent parcels of flats lying in the bed of Muddy River Creek,
an arm of the full basin of the Back Bay in Boston.

The cases were tried together in the Superior Court, without
a jury, before *Thompson,* J., the only evidence introduced being
the report of an auditor to whom the cases were referred.   The
evidence tended to show the following facts.

The demanded premises were situated between the thread of
Muddy River Creek and the marsh on either side of the stream.
The demandants in the first two cases were the owners, on the
southerly side of the creek, of the upland and the flats thereto
appurtenant, and the demandant in the third case was the
owner, on the northerly side, of the upland, prior to its taking
for park purposes by the city of Boston, and of the flats thereto

appurtenant.  The first-named tenant was the successor of the Boston and Roxbury Mill Corporation, and together with the other tenants, who were its trustees under a deed of trust from it, had, under an indenture from the Commonwealth dated December 27, 1856, "all the right, title, and interest of the said Commonwealth in and to the soil, freehold of the flats, and channel in the full basin."

Prior to 1820, Muddy River, a fresh-water stream which had a large flow in the winter and spring, and dwindled to a mere thread during several months in the year, ran unobstructed to the Charles River, and the tide ebbed and flowed therein above the demanded premises.  The lowest point of the demanded premises was nearly half a foot below actual mean low-water mark and from two to three feet above extreme low-water mark, so that at mean low water the tide covered a strip twelve feet wide on either side of the thread of the stream, and at the extreme low water of the spring tides the premises would remain bare of water, except that flowing in the stream, for about an hour and a half.  The entire width of the creek at the demanded premises at high water was about three hundred feet.

In 1820 the Boston and Roxbury Mill Corporation built the Mill Dam and the Cross Dam, which formed the full basin of the Back Bay, and constructed a sluiceway in the Mill Dam, replacing it when carried away, built with piers, a flooring, and gates, to receive the waters of the Charles River at flood tide, and to keep up the depth of water in the full basin at ebb tide. The full basin thereafter was kept constantly flowed, and the demanded premises were covered to the depth of about ten feet, until about 1865 or 1866, when the gates in the sluiceway in the Mill Dam were removed and were not replaced; but the foundation sill of the sluiceway, which projected about one foot and a half above mean low water and from three to four feet above extreme low water, was permitted to remain.  Thenceforward the tide ebbed and flowed through the sluiceway, and stood at low water to the depth of about two feet upon the demanded premises.

In 1834 the Boston and Worcester Railroad was built across the full basin, with a pile bridge, which was from time to time reduced in length, for the passage of the water, and in 1876 the

sluiceway was partly filled with stones, by the order of the board of health of the city of Boston, to keep up the water in the full basin in the summer and prevent a nuisance.  At some time prior to 1878, the full basin, by reason of these various obstructions, and by deposits of mud, sand, and other soft materials from the streams and from a sewer flowing into it, had become silted up in various places, so that the original channel of Muddy River, below the demanded premises, was filled to the depth of from a few inches to two feet above the original bottom.  By the bar thus formed, the line of mean low water upon the demanded premises was gradually changed, until it stood and remained at an artificial low-water mark above mean low-water mark.  After 1879, the Back Bay Park was laid out by the city of Boston, and so constructed as to cut off the ebb and flow of the tide from the demanded premises, and the sewer and the streams flowing into the full basin were diverted therefrom and made to flow elsewhere.  If, however, the sill of the sluiceway had been removed and the bottom restored to its natural state, and if the flow of water into the full basin had not been thus diverted and the tide not thus cut off, the current of the stream and the action of the tide would have been sufficient to prevent the formation of the deposit in the channel, and to cut through the bar, and the water at the demanded premises would have resumed its original level.

The demandants contended that they owned the flats down to the original extreme low-water line, " or to the thread of the Muddy River," on either side thereof.  The tenants contended that they owned, under their grant, either up to the artificial low-water mark, or to the "original mean low-water line," on either side of the thread of the stream.

Upon these facts, the judge found that the demandants were entitled to recover the whole of the demanded premises, and reported the case for the determination of this court.

*H. D. Hyde & H. R. Bailey,* for the tenants.

*W. G. Russell & H. W. Putnam,* for the demandants.

HOLMES, J.   These are three writs of entry, brought to recover three adjacent parcels of flats, bounded by Muddy River Creek, an arm of the full basin of the Back Bay in Boston. The demandants are owners of the upland.   The tenants are

grantees of all the right of the Commonwealth in the flats and channels in the full basin, by a deed dated December 27, 1856.

1. Portions of the premises lie between the original ordinary and extreme low-water marks. The tenants contend that these portions never belonged to the demandants' predecessors in title under the ordinance of 1647, and that the words of the ordinance, " shall have propriety to the low-water mark," should be construed as meaning to the ordinary low-water mark. But it has been settled for fifty years that they mean to extreme low-water mark. We cannot disturb a rule of property which has been acted on so long, on the strength of general reasoning. *Sparhawk* v. *Bullard*, 1 Met. 95. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 553, 558. *Wonson* v. *Wonson*, 14 Allen, 71, 82. *Attorney General* v. *Woods*, 108 Mass. 436, 440.

2. Formerly, at the lowest spring tides, all the demanded premises were bare of water, except the fresh water running in Muddy River, a natural stream, which in its minimum flow was a mere thread. At that time, therefore, the title of the riparian owners extended to the thread of the stream or creek. *Boston* v. *Richardson*, 13 Allen, 146, 155; *S. C.* 105 Mass. 351, 355. It follows that the demandants are entitled to recover all the demanded premises, unless something has happened to deprive them of some part of what once belonged to their predecessors in title.

The tenants put their case on the doctrine of accretion, assuming as their starting point that the channel of Muddy River belonged to the Commonwealth and passed by the grant of 1856. Perhaps it might be a sufficient answer to say, as we just have said, that this first assumption is a mistake with regard to the channel upon the premises, and that therefore there was no land to which the supposed accretion could attach, the lower channel being cut off by the bar hereafter mentioned, on which the tenant relies. But we will consider the facts a little further.

In 1820 and 1821 the Mill Dam and Cross Dam were built, and in consequence of these dams, their gates and sill, the placing of stones in the sluiceway, and other obstructions, the channel between the premises and the dams had become more or less filled up with mud, etc. This sediment of mud, called

by the tenants a bar, in connection with the sill of the dam, established an artificial low-water mark, which encroached upon the premises above mean low-water mark. The tenants argue, that, while the sudden raising of the water by the artificial structures made no change in the title, the subsequent gradual filling of the channel above the structures did make a change, and that the case is one of the gradual encroachment of water in consequence of natural and artificial causes combined. But we do not interpret the report as disclosing such a case. It is found that the accumulations were not sufficient to act as a dam and to resist the water, or to prevent its resuming its natural level had the artificial obstructions been removed. A series of artificial structures cut off the natural flow of the water, and set it back. Of course such an interruption was followed in time by more or less filling up and settling of sediment above it; but, as we read the report, the cause of the whole change is to be found in the dams and their adjuncts.

Furthermore, no change has taken place in the locus. No part of it has been washed away. Its relation to low-water mark is unchanged. After the change, as before, it was still unaffected by the ebb and flow of the tide for an hour and a half at extreme low water. What the obstructions did was simply to leave behind an inland salt-water lake when the tide was out. As was observed by the demandants' counsel, this often happens on the sea-shore, but no one supposes that the low-water mark or the limits of private ownership are affected by the fact.

For the reasons stated, we are of opinion that the tenants have no title by accretion. They do not argue that the demandants' land was taken by the Boston and Roxbury Mill Corporation by the right of eminent domain, when that company built its dams and flooded the premises. *Boston & Roxbury Mill Corp.* v. *Newman,* 12 Pick. 467, 482. *Boston Water Power Co.* v. *Boston & Worcester Railroad,* 16 Pick. 512, 522; *S. C.* 23 Pick. 360, 394. *Lowell* v. *Boston,* 111 Mass. 454, 466. *Isele* v. *Arlington Savings Bank,* 135 Mass. 142, 143. Nor is it contended that the demandants have lost their fee by adverse possession. It does not appear that the first-named tenant or its predecessor in title has done more than it had a right to do

under its charter, or that the demandants have been disseised for twenty years, if at all. *Tremont Improvement Co.* v. *Boston Water Power Co.* 10 Allen, 261. *Eastern Railroad* v. *Allen*, 135 Mass. 13, 16. *Drake* v. *Curtis*, 1 Cush. 395, 416, 417. *Charles* v. *Monson & Brimfield Manuf. Co.* 17 Pick. 70, 77.

We do not discuss these questions at length, as the tenants do not seek to raise them.      *Judgment affirmed.*