## WILLIAM A. TAPPAN *vs.* BOSTON WATER POWER COMPANY. EDWARD I. BROWNE & another *vs.* SAME.

Suffolk.   November 12, 13, 1891. — June 24, 1892.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Title to Flats — Colony Ordinance — Boundary — Tidal Channel — Fresh-water Stream — "Low-water Mark" — Pleading — Disclaimer — Judgment in Real Action.*

A channel, to be a boundary to flats, must be one from which the tide does not ebb at low water.

In the Colony Ordinance of 1641-47, providing "that in all creeks, coves, and other places about and upon salt water, where the sea ebbs and flows," the proprietor of the land adjoining "shall have propriety to the low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further," the words "low-water mark" mean the lowest line made by the receding tide with the land, and not the lowest line which a stream of fresh water emptying into the sea, or a cove or tidal river, makes with the land.

A writ of entry was brought to try the title to flats in a river lying between marsh lands on the easterly and westerly sides of the river, belonging respectively to the demandants and the tenant. The river was a fresh-water stream, and, prior to 1820, had a large flow in the winter and spring and a diminished flow in summer, and ran unobstructed to a larger river. It was navigable at certain stages of the tide to a point above the demanded premises, and the tide ebbed and flowed to a point above them. Between the lands of the respective parties was an island, which at ordinary high tide was nearly or entirely covered by water, and which was treated at the trial as flats. This island divided the river into two channels, which united below it; one called the easterly channel, which at high water ran nearer the demandants' land than the centre of the stream, and the other called the westerly channel, which ran nearer the tenant's land than the centre of the stream at high water. The demanded premises lay between the edge of the demandants' marsh land and the centre of the westerly channel, and the distance between the two lines was less than one hundred rods. At ordinary low water there was no water on the demanded premises except such as came from the flow of the river, and that was confined to the two channels. Certain dams were built in the larger river in 1820 and 1821, which thereafter affected the flow of the river in question. In 1885, this river was cut off at a certain point, and tide water was cut off at another point. It did not appear where the line of low tide was, except that it was below the demanded premises. The tenant disclaimed as to the land between the edge of the demandants' marsh land and the centre of the easterly channel. *Held,* that, under the Colony Ordinance of 1641-47, the demandants were entitled to recover so much of the flats as fell within straight lines drawn from the termini on the banks of the river at the ordinary stage of the water of the side lines of their marsh land to and at right angles with the centre line of the stream. FIELD, C. J., and KNOWLTON & LATHROP, JJ., dissenting.

In a writ of entry, the tenant filed a disclaimer as to a part of the demanded prem-
ises, and more than a year later pleaded *nul disseisin. Held,* that it was too
late, at the argument in this court, to object for the first time that the dis-
claimer should have been filed as a specification of defence with the plea of *nul
disseisin;* and that it must be regarded as having been so filed.

In a writ of entry, the tenant pleaded *nul disseisin,* with a disclaimer as to a part
of the demanded premises. The demandants did not discontinue the action as
to the part disclaimed, but the trial proceeded upon the pleadings as they stood,
and the court found generally in favor of the tenant. The finding was reversed
by this court as to the part not included in the disclaimer. *Held,* that the ten-
ant was entitled to judgment upon the disclaimer, but that this did not give
him title to the part disclaimed.

MORTON, J.   These two actions involve the title to flats in
Muddy River in Boston, lying between marsh lands on the east-
erly and westerly sides of the river, which belong respectively
to the demandants and tenant. Both were tried together, and
depend on the same facts. Evidence was introduced by the
parties of acts of ownership and possession by themselves and
their predecessors in title relating to a part of the demanded
premises; but the court was not satisfied that such acts had
been exercised. The cases therefore do not depend at all upon
possessory titles. The demandants also claimed title by accre-
tion. The findings of the court would seem to have disposed of
this claim, and it has not been argued.

The titles of the parties depend on the rights which owners of
lands on opposite sides of a stream like Muddy River have to
the interjacent flats in the natural condition of things under the
Colony Ordinance of 1641–47.

It appears that Muddy River is a fresh-water stream, and that
prior to 1820 it had a large flow in the winter and spring,
and a diminished flow in the summer, and ran unobstructed to
Charles River. It was navigable at certain stages of the tide
to a point above the demanded premises, and the tide ebbed
and flowed to a point above them. Between the lands of the
demandants in the second action and those of the tenant was
an island which at ordinary high tide was nearly or entirely cov-
ered by water, and which the presiding justice treated as flats.
This island divided the river into two channels, which united
below it; one called the easterly channel, which at high water
ran nearer the lands of the demandants than the centre of the
stream, and the other called the westerly channel, which ran

nearer the lands of the tenant than the centre of the stream at high water. The demanded premises lie between the edge of the marsh land of the demandants and the centre of the westerly channel, and the distance between the two lines is less than one hundred rods. At ordinary low water there was no water on the demanded premises except such as came from the flow of Muddy River, and that was confined to the two channels. The presiding justice was not satisfied that the tide ebbed from the easterly channel before it did from the westerly channel, or that the waters of the river ceased to flow in the easterly channel at the lowest spring tides, or whether they did or did not run through the westerly channel at the lowest spring tides. Certain dams were built in Charles River in 1820 and 1821, which thereafter affected the flow of Muddy River. The extent to which they affected it is not material. In 1885 Muddy River was cut off at Brookline Avenue, and tide water was cut off by the Back Bay Park.

It is not stated where the line of low tide was. We do not know whether it was where Muddy River emptied into Charles River, or above or below that point. It is evident that it was below the demanded premises; for it is found that at ordinary low tide the only water that flowed over them was that of Muddy River, flowing in the two channels above named.

At common law the title of the owner of land bounding on tide water only extends to ordinary high-water mark. *Commonwealth* v. *Charlestown*, 1 Pick. 180, 182. *Commonwealth* v. *Alger*, 7 Cush. 53, 65, 66. *Porter* v. *Sullivan*, 7 Gray, 441. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 477, 483, 491.

This applies to a stream which discharges fresh water, but in which the tide ebbs and flows. The test whether or not it is to be regarded as tide water is whether there is a regular rise and fall under the influence of the tide. *Attorney General* v. *Woods*, 108 Mass. 436. *Peyroux* v. *Howard*, 7 Pet. 324, 343. *Lapish.* v. *Bangor Bank*, 8 Greenl. 85.

The Colony Ordinance of 1641–47, however, extended the title of all proprietors of land adjoining creeks, coves, and other places where the tide ebbs and flows, to low-water mark, if not more than one hundred rods. It is under the title thus conferred that the demandants claim. The tenant has disclaimed in both cases as to the land between the edge of the demandants'

marsh land and the centre of the easterly channel. It contends that that channel is the demandants' boundary, and that their line does not go beyond the nearest tidal channel, whether that be one in which only fresh water flows at low tide or one from which the tide does not wholly ebb. It relies for this upon certain expressions in cases that have been decided by this court; and it is obliged in effect to concede that under it the title to the land between the channels may still be in the Commonwealth. We do not think the cases to which the tenant has referred us maintain the proposition on which it relies, or show that the low-water mark intended by the ordinance is the low-water mark of the fresh-water stream.

In *Sparhawk* v. *Bullard*, 1 Met. 95, 107, there was a question respecting the existence of a creek alleged to have separated the land demanded from the upland and flats belonging to the demandants. The jury were instructed that, "if they should find there was naturally and originally any such creek, in which the tide ebbed and flowed, and from which it did not ebb at the times when from natural causes it ebbed the lowest, this would constitute a boundary of the flats, beyond which the demandants would not by law be entitled to recover." These instructions, which had been given originally by Shaw, C. J., and were adopted by Morton, J. in a later trial of the same case, were excepted to, but this court held that they were correct. In *Ashby* v. *Eastern Railroad*, 5 Met. 368, 369, which was decided only two years and a half or thereabouts after *Sparhawk* v. *Bullard*, the opinion was given by Chief Justice Shaw, and certainly no intention is manifested to overrule that case. On the contrary, we think it conforms to it. In this case, also, the question was whether the land of the petitioner went to a channel. In defining what was meant by a channel the Chief Justice used the following language: "If this tract of flats called South River had no channel running through it, that is, no depression, from which the tide did not ebb at low water, then it must have been a cove." It is evident that the word "channel" is used in this sense throughout the opinion, and that he does not mean to say that a channel formed by a stream of fresh water, out of which the tide ebbed at low water, would constitute a boundary to flats. In *Walker* v. *Boston &*

*Maine Railroad*, 3 Cush. 1, 22, the same rule is laid down as in *Sparhawk* v. *Bullard*, and that case is cited in support of it. Chief Justice Shaw gives the opinion in this case also, and he says: " It appears, by the case, that the stream running from the tide mills, along through the westerly part of these flats, is a natural channel or creek, from out of which the tide does not ebb. It must therefore be a terminus to a claim of flats in that direction." In *Attorney General* v. *Boston Wharf Co.* 12 Gray, 553, 558; the rule laid down in *Sparhawk* v. *Bullard* is again affirmed in these words : " A natural and original creek, in which the tide ebbed and flowed, and from which it did not ebb entirely at the time when from natural causes it ebbed the lowest, would constitute a boundary of the flats." In *Drury* v. *Midland Railroad*, 127 Mass. 571, 581, the court say that a creek from which the tide does not wholly ebb is a natural boundary, and bounds the claims of all adjacent proprietors of flats. See also *Harlow* v. *Fisk*, 12 Cush. 302, 304. *Porter* v. *Sullivan*, 7 Gray, 441, 448, 449.

There is no suggestion in these cases that a tidal channel, from which the tide ebbs and through which a fresh-water stream flows at low tide, will constitute a boundary to flats, or that the fresh-water stream will constitute low-water mark. And we think it plain that a channel to be a boundary to flats must be one from which the tide does not ebb at low water. It is expressly found in the cases at bar that the tide ebbs from the channel over the demanded premises at low water, and it does not therefore constitute a boundary to the demandants' flats. It appears that it also ebbs from the other channel. It is immaterial on this point whether the tide ebbed from one channel sooner than the other, or whether there was or was not fresh water flowing in either or neither or both of them at low water, or whether one channel was wider than the other, or whether at one stage of the tide more water flowed in one than in the other, and at another stage of the tide this was reversed. The controlling fact is that the tide wholly ebbed from both channels at low water. The ordinance relates, so far as concerns the point which we are now considering, to land adjoining " creeks, coves, and other places about and upon salt water, where the sea ebbs and flows." It establishes that the proprietor of such land

" shall have propriety to the low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further." By low-water mark is meant the lowest line made by the receding tide with the land; not the lowest line which a stream of fresh water emptying into the sea, or a cove, or tidal river, makes with the land. It has nothing to do with a fresh-water stream or with a tidal channel through which only fresh water flows at low tide. Nothing in the ordinance indicates an intention to preserve the fresh-water stream or channel as a boundary below ordinary high-water mark. And the cases cited show it has not been done in applying it. The channel would not be the boundary even above high water mark. The rules of proprietorship on a fresh-water stream may furnish in a given case the best analogy for the division of interjacent flats on a stream below a point where the tide ebbs and flows, but beyond that they have no force.

How, then, in these cases, are these flats to be divided? The ordinance itself furnishes no guide. It simply declares a rule of property, leaving the court to make the division in such manner as appears to be just and reasonable. *Walker* v. *Boston & Maine Railroad*, 3 Cush. 1. *Gray* v. *Deluce*, 5 Cush. 9.

In applying it, the aim has been to secure a fair and equal division of the flats among those to whom they belonged. *Walker* v. *Boston & Maine Railroad*, 3 Cush. 1, 22. No fixed plan has been or can be adopted which will operate with equal justice in all cases. Certain general rules have been laid down, but even these yield to the circumstances of particular cases. Thus, for instance, it is said that the flats are to extend to low-water mark; *Porter* v. *Sullivan*, 7 Gray, 441, 442, 443; *Wonson* v. *Wonson*, 14 Allen, 71; *Sewall & Day Cordage Co.* v. *Boston Water Power Co.* 147 Mass. 61, 64; that, when practicable, they must be in front of the upland to which they are appurtenant, and also, when practicable, of equal width at the low-water line with the upland at the high-water line; *Gray* v. *Deluce*, 5 Cush. 9, 12; *Porter* v. *Sullivan*, 7 Gray, 441, 442, 443; and in the case of a cove from which the tide ebbs, and where there is no channel, they are to be divided by straight lines from the external lines of each proprietor's upland to a base line across the mouth of the cove, so as to give each pro-

prietor a distance upon the base line proportioned to the width at the ordinary high-water mark of his upland. *Rust* v. *Boston Mill Corp.* 6 Pick. 158.

In the present case, the line of low water is below the demanded premises. The flats are in the bed of a stream which extends some distance below the demanded premises before entering Charles River. It is obviously impracticable to extend the lines of division to low-water mark, or to follow the rules of division laid down for flats in a cove. The most satisfactory analogy would seem to be that presented by a fresh-water stream or river where the line of division between opposite proprietors is the thread of the stream. *Ingraham* v. *Wilkinson*, 4 Pick. 268, 273. *Bardwell* v. *Ames*, 22 Pick. 333, 354. *Knight* v. *Wilder*, 2 Cush. 199, 207, 208. *Hopkins Academy* v. *Dickinson*, 9 Cush. 544, 552. *Boston* v. *Richardson*, 13 Allen, 146, 154. In such a case each proprietor owns an equal share of the bed of the stream in proportion to his line on the margin and in front of or adjacent to his upland. Angell on Watercourses, § 11. The principle of division between them is, as in the case of flats, that of equality, and the division is effected by drawing lines at right angles from the termini of the side lines on the shore to and at right angles with the thread of the stream. *Knight* v. *Wilder*, 2 Cush. 199, 209. In a somewhat similar case respecting this very river, it was said that the title of the riparian owners extended to the thread of the stream. *Sewall & Day Cordage Co.* v. *Boston Water Power Co.*, *ubi supra.* And it seems to have been the view of the court, in cases where the tide wholly ebbed at low water from a tidal creek, that a boundary by it would convey the title to the flats to the centre of the creek. *Harlow* v. *Fisk*, 12 Cush. 302, 306. *Boston* v. *Richardson*, 13 Allen, 146, 159. Although in one case the margin of the creek was held to constitute the boundary. *Chapman* v. *Edmands*, 3 Allen, 512. That case, however, depended on the peculiar language used in the deed, which was thought to exclude the creek. By the thread of the stream is meant the centre line from one bank to the other, not when swollen by floods, or diminished by drought, but in its ordinary and natural condition. This may or may not coincide with the channel. That is immaterial. And it is immaterial also whether

there is one channel or more than one. *Hopkins Academy* v. *Dickinson*, 9 Cush. 544. *Pratt* v. *Lamson*, 2 Allen, 275, 285. *Boscawen* v. *Canterbury*, 23 N. H. 188. Angell on Water-courses, §§ 10, 11. Gould on Waters, § 198. What the result might be if it should appear that the land in the middle of the river, between the marsh land of the demandants in the second case and that of the tenant, was an island, we need not now consider. For the purposes of the trial it was treated by the presiding justice as flats, and this view seems to have been acquiesced in by all parties. Assuming that it is to be treated as flats, we think the demandants are respectively entitled to recover so much as falls within straight lines drawn from the termini on its banks of the side lines of their respective marsh lands, at the ordinary stage of the water, to and at right angles with the centre line of the stream.

The remaining question is whether judgment should be entered for the tenant on its disclaimers. The tenant first pleaded *nul disseisin*. More than a year after, the disclaimers were filed. The demandants object that they should have been filed as specifications of defence with the plea of *nul disseisin*. But no objection appears to have been made at the time of filing, or at any time before argument in this court, that they should not be considered as having been filed as specifications of defence under the plea of *nul disseisin*. We think the objection comes too late, and that they must be regarded as having been so filed.

The pleas of *nul disseisin* put in issue the title of the demandants, but admitted possession by the tenant. *Higbee* v. *Rice*, 5 Mass. 344, 352. *Burridge* v. *Fogg*, 8 Cush. 183. The disclaimers admitted the title and right to possession by the demandants of the tracts described in them. *Oakham* v. *Hall*, 112 Mass. 535, 539. The effect of the pleas of *nul disseisin*, with the disclaimers, was, therefore, to admit on the part of the tenant the title and right to possession of the demandants to so much of the demanded premises as lies easterly of the centre of the easterly channel, and to claim title in themselves as to the rest of the demanded premises. The demandants could thereupon have discontinued these actions as to the parts disclaimed. *Johnson* v. *Rayner*, 6 Gray, 107, 108. They did not do

so, and the cases went to trial upon the pleadings as they stood. The tenant having disclaimed as to a part of the demanded premises, the only issue on the disclaimers was, not whether it had any right or title to those portions, but whether it had asserted any right or done any acts inconsistent with its disclaimers. *Proprietors of Locks & Canals* v. *Nashua & Lowell Railroad*, 104 Mass. 1, 10. The finding of the court was generally in favor of the tenant, and there is nothing to show that on this branch of the case it was erroneous. The tenant is, therefore, entitled to judgment upon its disclaimers, and for its costs from the time of filing them. Pub. Sts. c. 173, § 9. This does not give it title to the tracts disclaimed. The disclaimers are conclusive, as between it and the demandants and their privies, as to the right and title of the demandants to the lands included in the disclaimers. *Porter* v. *Rummery*, 10 Mass. 64. *Prescott* v. *Hutchinson*, 13 Mass. 439, 440. *Oakham* v. *Hall*, 112 Mass. 535, 539. If, therefore, the demandants eventually should succeed in also establishing their title to so much of the demanded premises as lies between the easterly channel and the thread of the stream, they will have established their title as between themselves and the tenant and its privies to all of the demanded premises that fall within the lines previously described. Stearns on Real Actions, (2d ed.) 197. While a disclaimer filed as a specification of defence under the present method of pleading in real actions is not, strictly speaking, a plea, it was treated as having the same effect as one in *Oakham* v. *Hall*, *ubi supra*, and the judgments in these cases would have relation to it. In *Cole* v. *Eastham*, 124 Mass. 307, 310, the court regarded the pleadings as intending to raise only the question whether the tenant had such possession of the demanded premises as to exclude the demandants, or entitle them to consider themselves disseised, and accordingly directed judgment for the demandants for possession, and for the tenant for its costs.

We think upon the main question the finding should have been, upon the facts reported, for the demandants to the centre of the stream, and that, in accordance with the terms of the report, the findings must be set aside, and a new trial granted, and it is                                        *So ordered.*

The Chief Justice and Justices Knowlton and Lathrop are of opinion that, when land bounds on a running stream which is within the ebb and flow of the tide, and out of which the tide wholly ebbs, but which at ebb tide is still a stream with well defined banks, the Colonial Ordinance of 1641–47 does not extend the boundary of the land of the riparian or littoral owners across the stream, or beyond the line of low water of the stream.

*W. G. Russell & H. W. Putnam*, for the demandants.
*H. D. Hyde & G. D. Braman*, for the tenant.