THE PEOPLE OF THE STATE OF NEW YORK ex rel. ANDREW CORNWALL, Relator, *v.* TIMOTHY L. WOODRUFF and Others, as Commissioners of the Land Office of the State of New York, Respondents.

*Grant of land under the waters of a cove — relative rights of several patentees — access to a dock in the cove cut off — who are the adjacent owners — how the land under water should be apportioned — lands formed by alluvion.*

A riparian owner, who receives a patent from the Commissioners of the Land Office for lands under the waters of a cove in the St. Lawrence river, takes it subject to the power of the State to grant to the adjoining riparian proprietors the same rights and privileges to the lands under the remaining waters of the cove; by erecting a dock thereon the first patentee cannot deprive the adjacent owners of any of their rights as owners of the uplands, among which is the right to apply for and receive grants of land under the waters adjacent to their uplands.

The fact that grants made to such adjoining riparian proprietors cut off access by boat to a dock that the first patentee has built fronting on the cove, although they will not cut off access from the channel of the river to the front of the first patentee's lot, does not deprive him of any property right.

In determining who are the adjacent owners and how grants of land under water should be apportioned between them, the same principles apply as govern the division between riparian proprietors of lands formed by alluvion.

The rules applicable to the acquisitions by riparian proprietors of land formed by alluvion, stated.

CERTIORARI issued out of the Supreme Court and attested on the 22d day of June, 1897, directed to Timothy L. Woodruff and others, Commissioners of the Land Office of the State of New York, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings in making a grant of land under water in Alexandria bay to Charles W. and Esther A. Crossmon, owners of the adjacent uplands.

This case comes before us upon a writ of certiorari to review the action of the Commissioners of the Land Office in granting to Charles W. Crossmon and Esther A. Crossmon certain lands under the waters of the St. Lawrence river, in front of, and adjacent to, the uplands of said Crossmons. The relator, Mr. Cornwall, and the Crossmons own lands adjacent to each other on the south bank of the St. Lawrence river; at the point where their properties join there is an indentation or cove about 100 feet in depth; its original width does not appear.

In 1883 Cornwall and Walton and the Crossmons, respectively, made application to the State for lands under the waters adjacent to their uplands, and, in accordance with such application, grants were made to them, which included all the lands under the waters of the cove, and extended some distance into and under the waters of the St. Lawrence, immediately in front of their respective properties. The lateral lines dividing the lands applied for and granted were identical; that is to say, the easterly boundary of the lands applied for and granted to Cornwall and Walton was the westerly boundary of the lands applied for and granted to the Crossmons; the relator has succeeded to the rights of Cornwall and Walton under such grant.

Cornwall built a dock along the front of his property facing the channel of the St. Lawrence, and extended it down into this indentation or cove, the southerly part of such dock extending easterly several feet beyond his line, into and upon that portion of the cove granted to the Crossmons.

Upon the lands so reclaimed from the cove, and within a few feet of the edge of the dock facing the cove, he erected a building for the storage and sale of coal; he also has upon his side of the cove a landing place for small row boats. Into what is left of the cove, small boats can, and do, come, and vessels carrying coal unload at the dock in front of relator's coal house.

The Crossmons erected a dock upon the north shore of their land facing the channel of the St. Lawrence, apparently, from the maps, extending a few feet down into, and in front of, the easterly shore of such cove; the distance from the end of their dock facing the channel of the St. Lawrence to the end of the dock of the relator facing the channel of the St. Lawrence, is about 167 feet, constituting what is now the mouth of the cove.

The Crossmons own the land on the east and southerly sides of the cove, and have thereon a summer hotel located about at the foot of the cove. They allowed the grant made to them in 1883 of the lands under the waters of the cove to lapse.

In December, 1896, they made another application covering the lands under the waters of the cove, and in the waters of the St. Lawrence, applied for and granted to them in 1883, which application has been granted, the intention being to fill up such cove and to ornament and beautify the grounds so made in front of their hotel, and extend their dock fronting the St. Lawrence across the mouth of the cove as it now is, which will shut off access by boats to that portion of the relator's dock now extending southerly into such cove. The evidence shows that, while perhaps it will be less convenient, the relator will still be able to take coal into his coal house from boats landing at his dock facing the channel of the river, and the Commissioners of the Land Office, in their return to the writ of certiorari herein, certify "that the making of this grant will not interfere with the full and free access to the relator's coal dock," and they also certify that they "determined that the making of the said grant would not interfere with navigation."

*Henry Purcell,* for the relator.

*T. E. Hancock, Attorney-General,* and *Geo. C. Baker,* for the respondents.

HERRICK, J.:

I think the indentation or cove in question in this case must be regarded as part of the St. Lawrence river.

The Commissioners of the Land Office have power to grant lands under the waters of navigable rivers "to the owners of the lands adjacent to the lands under water." (Laws of 1894, chap. 317, § 70.)

And in determining who are adjacent owners, and how grants of land should be apportioned between adjoining adjacent owners, it seems to me the same principles apply as govern the division between riparian proprietors of lands formed by alluvion. Tested by them, the land here in question should be apportioned between the relator and the Crossmons, in proportion to their frontage upon the main channel of the St. Lawrence in a practically straight line, and not as such line or frontage would be extended by following the shore line of the indentation or cove.

Land formed by alluvion in a river is to be divided among the different riparian proprietors according to the following rules : " 1. To measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards or feet each riparian proprietor owned on the river line. 2. The next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly-formed bank or river line into 200 equal parts, and appropriate to each proprietor as many portions of this new river line as he owned rods on the old ; then, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old to the points thus determined as the points of division on the newly-formed shore.   *   *   *   It (this rule) may require modification, perhaps, under particular circumstances. For instance, in applying the rule to the ancient margin of the river, to ascertain the extent of each proprietor's title on that margin, the general line ought to be taken, and not the actual length of the line on that margin, if it happens to be elongated by deep indentations or sharp projections." (*Deerfield* v. *Arms*, 17 Pick. 41.) The same rule is recognized in *Batchelder* v. *Keniston* (51 N. H. 496); *Jones* v. *Johnston* (59 U. S. [18 How.] 150) ; *Johnston* v. *Jones* (66 id. [1 Black] 209); *Knight* v. *Wilder* (2 Cush. 199); *Nott* v. *Thayer* (2 Bosw. 10), and *O'Donnell* v. *Kelsey* (10 N. Y. 412).

The same principle has been applied in this State to patents granted by the State to lands under water.

The lateral limits of land granted to a patentee "must be perpendicular to the shore, not to so much of it only as adjoins the subject of the grant, but to its general course ; otherwise, where the shore is irregular and crooked, the grants to which adjoining owners would be entitled (should any be made) might conflict with each

other, and there would be no principle upon which the controversies could be settled." (*People* v. *Schermerhorn*, 19 Barb. 540.) This was approved in *Knickerbocker Ice Co.* v. *Shultz* (116 N. Y. 382, 388).

Tested by this rule, the relator has received all he is entitled to, if not more, and the grant to the Crossmons is no more than the commissioners had power to grant.

The relator contends, however, that the effect of the grant is to deprive him of some of his rights as a riparian proprietor. I do not see that his rights as such proprietor have been, or will be, violated.

The rights of a riparian proprietor bounded upon a navigable stream are of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier, for his own use or for the use of the public. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Sage* v. *Mayor*, 154 id. 61; *Yates* v. *Milwaukee*, 77 U. S. [10 Wall.] 497.)

The relator will be deprived of none of these rights by the grant he is seeking to set aside; he will still have access from his front to the channel of navigation upon the river, and the cases that he has referred to to sustain his contention are where grants to other parties have interfered with or obstructed the access of owners of uplands to the channel or navigable portion of the river. The only interference here is by cutting off access by boats to the dock that he has built in the cove which indents the line of the river fronting his property and that of the Crossmons. He contends that, by virtue of the grant that was made to him, he has acquired a property right of passage over the waters of this cove or bay to his dock thereon, and to his landing place for skiffs.

I do not think this contention can prevail. There are many cases in the books as to the division among adjoining proprietors, of lands under the waters of coves, all of which, however, are to the effect that such lands should be so divided as to give them a ratable frontage at the mouth of the cove or bay, combined with a ratable distribution of the lands of the cove under the water. (See *Rust* v. *Boston Mill Corporation*, 6 Pick. 156; *Tappan* v. *Boston Water Power Co.*, 157 Mass. 24.)

These rules, however, it is needless for us to examine, because it

appears that in the year 1883 grants of land under the waters of this cove, together with grants of land under the water directly fronting on the river St. Lawrence, were made both to the relator and to the Crossmons, each of whom made applications for such grants, and the lands under the waters of the cove were divided between them. And it seems to me fair to assume that the relator at that time applied for and obtained all that he was entitled to.

The application now made by the Crossmons, and the grant made to them, which it is here sought to review, contains no more land under water than was granted to them in 1883; it gives them a front upon the river at the mouth of the cove, which does not interfere with the relator's front on the river or at the mouth of such cove, and awards to them the land under the waters of the cove to the same extent, and no more, that was given to them when, apparently, by common consent it was divided between them and the relator in the year 1883, which division, so far as the record here discloses, seems to have been an equitable one, whereby such lands were ratably apportioned between them.

The relator's contention would result in this, that by the grant formerly made to him of the lands under the water, he acquired, not only the right to fill in such lands and appropriate them to his own use, but also thereby acquired the right to insist that the remaining portion of the waters of the cove should remain as they were, and the lands under them remain unfilled, and that the State should not thereafter grant them to the riparian proprietors, thus practically appropriating the whole cove to the use of the relator and depriving the other adjacent proprietors of their equal rights to the lands under the waters in such cove.

When he received his patent for lands under the water he took it subject to the power of the State to grant to the adjoining riparian proprietors the same rights and privileges to the lands under the remaining waters of the cove, and by erecting a dock thereon he could not deprive the adjacent owner of any of his rights as owner of the uplands, among which is the right to apply for and receive grants of land under the waters adjacent to his uplands.

The same claim, in principle, was made in a case where the prior builder of a mill and dam upon a stream complained of the subsequent erection of another mill and dam upon the same stream that

it would interfere with his prior-acquired rights.  The court said: "Whatever their" (speaking of the plaintiffs) "pretensions to build a dam and mills adjoining their own land may have been, it must be conceded that, so far as the public are concerned, the defendants had the same right opposite their ground, provided it could be done without injury to the navigation of the river.  This is not pretended to be the case; but as the plaintiffs' mills were first erected it is said that if the defendants have any right of this kind they must so use it as not to injure their neighbors.  Without denying this position, which is indeed become a familiar maxim, its operation must be restrained within reasonable bounds so as not to deprive a man of the enjoyment of his property merely because of some trifling inconvenience or damage to others; of this nature is the injury now complained of so far at least as it is supported by proof.  It is not pretended that the water is diverted, or that less business can be now done at the plaintiffs' mill than formerly, but they are obliged to bring their logs a very little farther round in the river (in order to get them into the dam), which is the principal, if not only, inconvenience they are exposed to by the defendants' conduct. Were the law to regard little inconveniences of this nature, he who could first build a dam or mill on any public or navigable river would acquire an exclusive right, at least for some distance, whether he owned the contiguous banks or not; for it would not be easy to build a second dam or mound in the same river, on the same side, unless at a considerable distance, without producing some mischief or detriment to the owner of the first."  (*Palmer* v. *Mulligan*, 3 Caines, 307, 313.)

So here the relator may, perhaps, be put to some little inconvenience by being deprived of access by water to his dock fronting upon the water of the cove by reason of the grant to the Crossmons; his coal, like the logs in the *Palmer-Mulligan* case, may have to be carried a little farther before it can be placed in the coal house, but he cannot, by his prior grant, and because of such inconvenience to himself, deprive the adjoining adjacent proprietor of his equal right to a grant of the land under the waters in front of his premises, or to a ratable frontage upon the channel of the river in front of his uplands.

For these reasons, and because the Commissioners of the Land Office have found that the grant to the Crossmons will not interfere with navigation, which finding, I think, is sustained by the evidence, the grant of said commissioners should be confirmed and the writ of certiorari quashed, with fifty dollars costs and disbursements.

All concurred.

Grant of commissioners confirmed and the writ of certiorari quashed, with fifty dollars costs and disbursements.