RAMSEY LUDINGTON et al., Appellants-Respondents, v RUSSELL
L. MARSDEN et al., Respondents-Appellants.

Fourth Department, July 14, 1992

## APPEARANCES OF COUNSEL

*Bond, Schoeneck & King (James Wilber* of counsel), for appellants.

*Hoffmann, Hubert, Hoffmann & Greenough (Terrance J. Hoffmann* of counsel), for respondents.

## OPINION OF THE COURT

Denman, P. J.

This is an action to settle a boundary dispute over a peninsula of accreted land abutting the Little Salmon River near its outlet to Lake Ontario in the Town of Mexico, New York. The adjoining landowners and competing claimants to the peninsula are plaintiffs Ramsey and Shirley Ludington, owners of a parcel lying generally north of the disputed property, and defendants Russell and Charlene Marsden and Francis and William Koehler, owners of two separate parcels, lots 11 and 12, respectively, lying generally east of it. Critical to an understanding of this case are several surveys: the 1955 "King" survey commissioned by the Marsdens' and Koehlers' common grantor, Loren Marsden; the 1965 "Hackett" survey for the Ludingtons; the 1986 "Getman" surveys of the Marsden and Koehler properties; and the 1988 "Venditti" survey ordered by the trial court. Also relevant are the property descriptions contained in the deeds of the parties and their predecessors.

### CHANGES TO THE SHORELINE

The surveys and deeds indicate that the three properties in question lie near a 90 degree bend in the Little Salmon River. The river flows in a generally northerly direction past the Marsden and Koehler properties to the east, then flows generally westerly as it passes the Ludington property to the north before resuming its northerly flow into Lake Ontario. The surveys and deeds also show that the shoreline and centerline of the river have changed drastically over the years in the vicinity of the subject properties. The centerline of the river has shifted to the west in relation to the Marsden and Koehler properties and to the south in relation to the Ludington property. More importantly, several features of the shoreline have changed over the years. Whereas, historically, there was a large area lying between the low water mark and high water line of the river in this vicinity, a large area of permanent highlands, including the disputed property, now lies west (i.e., riverward) of the low water mark described in the 1939 deed of the Ludingtons and depicted in the 1955 King survey. In fact, it appears that a portion of the disputed property consists of highlands that now exist west of the former centerline of the river described and depicted in the various deeds and surveys. The property in dispute lies to the west of the

Marsden and Koehler properties and to the south of the Ludington property. The disputed land lies outside the deed descriptions defining all three properties, a circumstance that, by itself, strongly implies that the shoreline has changed.

## THE DEED DESCRIPTIONS

The parties derive title to their respective properties from a common grantor, Wilbur Jordan. The Jordan property lay generally between County Route 40 to the north and east and the Little Salmon River to the west and south. In 1939, Jordan conveyed to Homer and Marjorie Ludington a portion of his property bounded on the north by Route 40 and on the south by the river. The deed described the east boundary of the Ludington property as running from the center of the highway (at a right angle with it), a distance of "490 feet more or less to low water mark of Salmon River". The southern boundary of the property was described as running "along low water line of said river 160 ft." The record contains no survey made contemporaneously with the 1939 conveyance. The relevant boundaries of the Ludington property are depicted, however, in the 1955 King survey. The King survey depicts the east and south lines of the Ludington property exactly as described in the 1939 deed, i.e., as running south from the road 490 feet to the low water mark of the river, thence running westerly along the low water line.

The Ludington property was conveyed in 1963 to plaintiffs Ramsey and Shirley Ludington. The 1963 deed contains the same property description as the 1939 deed; nevertheless, the Hackett survey, performed two years later, measures the Ludingtons' east line as running approximately 550 feet from the road to the "observed" water line. In other words, the Hackett survey, upon which plaintiffs base their claim, depicts the river bank in the southeast corner of the property as being about 60 feet farther from the road than as described in the Ludingtons' deed and that of their predecessor and as depicted in the King survey performed 10 years earlier.

The King survey was made in contemplation of Jordan's proposed sale of the remainder of his property to Loren Marsden. That conveyance, which took place in March 1956, encompassed approximately 11 acres bounded on the north and east by Route 40, on the south by property previously acquired by Loren Marsden, and on the west by the Little Salmon River and the Ludington property. As illustrated by

the King survey, the 1956 deed describes the southern boundary of that large parcel as running 620 feet from the highway to "a point in the center of Little Salmon Creek". The deed states, and the King survey depicts, that the west line of the 11-acre parcel runs from the aforementioned point on the center line of the creek, "thence N. 5° 43' W. 270 feet to a point in the low water line of said Little Salmon Creek, said point being in the south east corner of the Homer Ludington property and being S. 5° 43' E. 490 feet measured at right angles from the center line of the said County Highway Route #40 leading from Texas to Mexico Point East side; thence N. 5° 43' W. 490 feet along the east line of the Homer Ludington property to its point of intersection with the center line of said County Highway Rt. No. 40." Thus, most of the west line of the 11-acre 1956 conveyance was coterminous with the east line of the Ludington property. The remainder extended under water, and eventually ran along the centerline of the river, on the same bearing as that common boundary.

After acquiring the 11-acre parcel from Jordan, Loren Marsden combined it with his previously acquired property to the south. He then subdivided that portion of it lining the east side of the river into 12 lots, each measuring 75 feet in width. We are concerned in this case with subdivision lots 11 and 12, the northernmost lots, which now are owned by defendants Marsden and Koehler, respectively. The 1955 King survey shows that, at the time, the south sidelines of each of those lots extended to the west below the high and low water line of the river to the centerline of the river. Further, the survey shows that the west lines of those lots were on the same bearing as the east line of the Ludington property. Finally, the survey shows that the southern boundary of the Ludington property, i.e., the then low water mark of the river, intersected the west boundary of lot 12 at a point approximately 45 feet from the centerline of the river. Thus, at that time, the southwest corner of lot 12 was permanently under water.

The Koehlers acquired lot 12 in 1984. Their deed, like the deeds of their predecessors, describes their property exactly as depicted in the 1955 King survey. The Koehler property is described as being bounded on the south by a line that runs "71 feet to [through] highwater mark on East bank Little Salmon Creek; thence [an undefined distance] on same course to center line of said creek" and as having a western bound-

ary that runs from the aforementioned point at the center of the creek a distance of 75 feet on a bearing of north 5 degrees, 43 minutes west, the same bearing as the east boundary of the Ludington property. Additionally, the King survey makes clear that the northernmost 30 feet or so of the Koehlers' west line constitutes the southernmost segment of the Ludingtons' east line.

The Marsdens acquired lot 11 from Loren Marsden in 1984. Their deed describes their south and north sidelines as running an undefined distance "to the centerline of Little Salmon River", and describes their western boundary as running "up said river centerline".

The 1984 deed descriptions notwithstanding, the 1986 Getman surveys and the 1988 Venditti survey show drastic changes in the shoreline and centerline of the river since the 1955 King survey. The western boundaries of lots 11 and 12 no longer correspond with the centerline of the river. Indeed, lot 11 would now be landlocked by the accreted peninsula (the property now in dispute) but for a narrow lagoon extending onto that property. Lot 12 is now landlocked by the accreted peninsula.

### THE COURT'S DECISION AND THE CONTENTIONS ON APPEAL

Following a nonjury trial on the issues of deed rights, riparian rights, and adverse possession, Supreme Court granted judgment awarding most of the peninsula to the Ludingtons and a small portion to the Marsdens. The court found that the deeds of those parties were in conflict but that both had valid riparian claims to that portion of the disputed property contiguous to their deeded properties. Contrastingly, the court found that the Koehlers' deed did not conflict with the others and that they did not possess riparian rights entitling them to a proportionate share of the peninsula. The court also found that the Ludingtons' proof was insufficient to support their claim of title by adverse possession to the entire peninsula.

On appeal, the Ludingtons contend that they are entitled to the entire peninsula. They contend that the court erred in construing the granting clause of their deed, in finding that the shoreline had been altered by accretion, and in rejecting their adverse possession claim. On their cross appeal, defendants Marsden and Koehler contend that the court erred in awarding the Ludingtons too large a share of the disputed

peninsula and in excluding the Koehlers' riparian claim to a portion of it.

## THE LUDINGTONS DID NOT ACQUIRE TITLE TO THE DISPUTED PROPERTY BY ADVERSE POSSESSION

■ We agree with the court's rejection of the Ludingtons' adverse possession claim. They did not prove, by clear and convincing evidence, that they actually possessed the disputed property for the prescriptive period, and that such possession was hostile and under a claim of right, open and notorious, exclusive, and continuous (see, *Belotti v Bickhardt,* 228 NY 296, 302; *Franzen v Cassarino,* 159 AD2d 950, 951).

## THE PARTIES' DEEDS ARE NOT IN CONFLICT, NOR DO THEY FURNISH A BASIS FOR GRANTING PRIORITY OF TITLE TO ANY PARTY

The Ludingtons' primary contention on appeal is that the court erred in awarding to the Marsdens (and properly denied to the Koehlers) any newly formed land located west of the long-defined western boundaries of lots 11 and 12. The Ludingtons contend that, since their eastern boundary is but the extension of defendants' western boundaries, they must be awarded all land lying west of that line. Following that logic, however, if the Ludington property extends no farther south than 490 feet from the road, the Marsdens and Koehlers should be entitled to all new land formed south of that former low water line.

■ Based upon our examination of the record, we conclude that the parties' respective deeds are not in conflict and that there is no overlap between the properties described therein. The Ludingtons' east boundary is merely the extension of the Marsdens' and Koehlers' west boundary, and indeed a portion of it is coterminous with a segment of the Koehlers' west line. We also conclude that, by virtue of the obvious changes that have occurred in the centerline and shoreline of the river, the deeds no longer reflect the actual situation. It is clear that a large peninsula of land has formed wholly outside the deed description of the Ludington property and largely outside the deed descriptions of the Marsden and Koehler properties. The part of the peninsula in dispute lies outside the deed description of any party. Thus, the parties may not claim exclusive

title to the disputed parcel by virtue of their own deed description or those of the other parties. The fact that the centerline and shoreline of the river have shifted west in relation to the Marsden and Koehler properties and south in relation to the Ludington property cannot have the effect of enlarging anyone's deed description. The changed shoreline merely results in more or less of a particular party's deeded property being currently under water. The deed boundaries remain the same and, thus, the deeds provide no basis for granting priority of title to any party, but merely establish reference points for dividing the disputed property pursuant to principles of riparian law.

### UNDER RIPARIAN PRINCIPLES, THE ACCRETED LAND SHOULD BE EQUITABLY DIVIDED ON A PROPORTIONAL BASIS AMONG ALL PARTIES

■ Pursuant to riparian principles, the accreted land should be equitably divided on a proportional basis between the adjoining owners, such division preserving water frontage in proportion to that of the lands as initially conveyed *(see, O'Donnell v Kelsey,* 10 NY 412, 414-415; *see also, People ex rel. Cornwall v Woodruff,* 30 App Div 43, *affd* 157 NY 709; *Carlino v Barton,* 76 Misc 2d 240, 244; *see generally, Cramer v Perine,* 224 App Div 686, *revd on method of apportionment* 251 NY 177).* The principle of proportional division stems from the rule that riparian owners "are entitled to lands made by accretion or reliction in front of their property and contiguous thereto" but may not "claim beyond the point where such accessions began to be made adjacent to the property of adjoining owners" *(Mulry v Norton,* 100 NY 424, 436, 437). "[T]he right of one owner of uplands to follow and appropriate [such accretions] ceases when the formation passes laterally the line of his coterminous neighbor" *(Mulry v Norton, supra,* at 437).

■ Initially, we conclude that all parties to this dispute are riparian owners. The Koehlers' deed and those of their predecessors describe their southern sideline as extending to the centerline of the river. Those deeds additionally describe the western line of lot 12 as running an undefined distance (but apparently about 45 feet) to a point where it intersects the former low water mark. Thus, at one time, the major portion of the western boundary of lot 12 lay under water. As a result

of the accretion of a large peninsula to the west of lot 12, however, the Koehlers' deed boundaries no longer extend to the water.

Notwithstanding the landlocking of lot 12, we conclude that it remains a riparian parcel. The applicable rule is that an abutting owner is entitled to lands formed by accretion or reliction contiguous to his property. Contrary to the trial court's conclusion, the rule should not be any different merely because the accretion has taken place along the entire former shoreline of lot 12. To exclude the Koehlers from the disputed land would violate the rule of proportional division. A riparian owner properly claims the accreted land formed contiguous to his shoreline, but may not "claim beyond the point where such accessions began to be made adjacent to the property of adjoining owners" *(Mulry v Norton, supra,* at 437). "[T]he right of [the Ludingtons] to follow and appropriate [the accretion] ceases when the formation passes laterally the line of [the Koehlers]", and vice versa *(Mulry v Norton, supra,* at 437). In awarding the Ludingtons the bulk of the disputed land and awarding none to the Koehlers, the court improperly awarded the Ludingtons land that is not contiguous to their property. That portion that is contiguous to the Koehlers' property must be awarded to them.

█ Having determined that all three adjacent owners are entitled to a share of the accreted land, we must then determine how the property should be apportioned. The precise method of apportionment varies from case to case, depending on the size and configuration of the properties in relation to each other and to the body of water *(see generally,* 63 NY Jur, Waters and Watercourses, § 265 [rev ed]). We find that the subject property is properly apportioned by drawing two lines from (and perpendicular to) the present centerline of the Little Salmon River to two points on the western boundary of lot 12 *(see, Calkins v Hart,* 219 NY 145, 148, *rearg denied* 219 NY 626; *see generally,* 1 NY Jur 2d, Adjoining Landowners, § 85). Line No. 1 should be drawn from the present centerline of the river to the southwest corner of lot 12/northwest corner of lot 11. Line No. 2 should be drawn from the present centerline of the river to the 490-foot point at which the western boundary of lot 12 intersects the southern boundary of the Ludingtons' property. The Marsdens should be granted that part of the accreted property lying south of line No. 1. The Koehlers should be granted that part of the accreted land lying between line No. 1 and line No. 2. The Ludingtons are

entitled to the remainder, i.e., the part lying north of line No. 2. Resolving the dispute in that fashion grants all parties that portion of the accreted land that lies contiguous to their own property, and preserves as nearly as possible the water frontage initially enjoyed by them.

Accordingly, the judgment should be modified to award each party a proportionate share of the disputed land in accordance with the foregoing.

BOOMER, PINE, BALIO and FALLON, JJ., concur.

Judgment unanimously modified, on the law, and, as modified, affirmed, with costs to defendants in accordance with the opinion by DENMAN, P. J.