## JENKS et al. v. MILLER et al.

(Supreme Court, Appellate Division, Second Department. February 19, 1897.)

1. LITTORAL OWNERS—PIERS—RIGHT OF ACCESS.
    One who erects a pier in front of his upland, on lands under water, granted him by the state, acquires no exclusive right to waters in front of adjacent proprietors; hence he cannot enjoin the erection, otherwise lawful, of a pier which will cut off a side approach to his pier.

**2. RIVER AND HARBOR ACT—IMPAIRMENT OF NAVIGATION.**

The extension of the upper of adjoining piers 40 feet into a shallow channel of a broad, navigable river does not "impair navigation, commerce, or anchorage," within the river and harbor act (25 Stat. 425), as amended by 26 Stat. 454, § 7, where the channel does not extend above the upper pier, and is seldom traversed, and then by vessels of but small capacity, and principally by the pier owners, and the extension does not obstruct the vessels of the lower owner in reaching their pier, but destroys merely the facility with which they may be warped along and moored to its side.

**3. SAME—INJUNCTION.**

The construction of a pier without the consent of the secretary of war, by an upland owner on a navigable stream, will not be enjoined at the instance of an adjoining pier owner whose rights will not be substantially harmed by the act complained of.

Appeal from special term, Westchester county.

Action by Joseph Jenks and others against John F. Miller and J. Henry Holden to enjoin the extension of a pier into the river at Sing Sing, and to require the removal of piles already driven in the erection thereof. From a judgment for plaintiffs (40 N. Y. Supp. 1088), defendants appeal. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Smith Lent, for appellants.
Nelson Zabriskie, for respondents.

GOODRICH, P. J. The defendants own a pier at the foot of Main street, Sing Sing, extending into the Hudson river. It is 58 feet wide. South of defendants' pier, also at the foot of Main street, is a pier 60 feet wide, owned by the plaintiffs, and separated from it by a slip 32 feet wide. Both piers extend the same distance into the river. There is also a slip below the plaintiffs' pier, 32 feet wide, and below that a pier also owned by the plaintiffs, which is 100 feet shorter than the plaintiffs' upper pier, leaving a large space of clear water. The plaintiffs' boat is accustomed to land and tie up at night in this slip on the southerly side of their upper pier. Outside of the piers, and extending to the main channel of the river, a distance of three-fifths of a mile, are flats, the water upon which is about seven feet deep, and this water is infrequently used by vessels. Just north of the defendants' pier is a creek which empties into the river, and, being subject to violent freshets, deposits large quantities of sand on the flats and in front of the docks. It is alleged in the moving affidavits, and declared by the learned judge in his opinion at special term, that one object of the addition is to prevent this deposit, and the evidence shows that the addition would do much to prevent it, especially in front of the defendants' dock, where it shoals the water so as to hinder the mooring of coal boats and barges at the end of their pier, where there is at present only three or four feet of water. The defendants, as shown by the diagrams in evidence, began to build out into the river an addition to their dock, 40 feet in length, the northerly line being an extension of the northerly line of the pier, the addition to be about 15 feet narrower than the present pier. There

is some evidence that the body of the proposed dock is somewhat to the south of the place shown on the diagram, but the defendants would be concluded by their own maps from any other location, if it were needful to insert such a provision in the judgment. The plaintiffs own, and for about 10 years have been running daily to their dock, a passenger and freight steamboat, and claim that in going up the river, and in docking their steamboat, it is sometimes necessary to lap the bow of their boat some 5 or 10 feet upon the outer or river end of the defendants' pier, preparatory to warping the boat into its berth on the lower side of their own pier, and that the defendants' proposed addition will seriously interfere with, if not practically destroy, this beneficial use of their own pier, and prevent them from warping their boat into the slip, or from landing passengers and freight while moored at the end of their pier.

The boat is 140 feet in length, and the plaintiffs' dock 60 feet in width, the slip between the two docks 32 feet, and the slip south of plaintiffs' pier is 32 feet wide, with open water of 100 feet; and it is somewhat difficult to see why the boat cannot be warped into its slip without lapping the defendants' pier, as from the outer lower corner of their dock, which is the turning point of the operation, there is over 90 feet of water space for the bow, before it reaches the lower line of the defendants' pier, considerably more than one-half the entire length of the boat. If the plaintiffs, with a boat 140 feet in length, have the right to prevent the defendants building out their pier, there is no reason why they may not use a larger boat, which would cover the whole front end of the defendants' pier, and thus prevent them from occupying the end of their pier, even when they needed to have their own boats moored there for loading and unloading. The average depth of water at the lower end of the defendants' pier is only 6 feet at low water, while the boat draws about $7\frac{1}{2}$ feet, light, and something more when loaded. It is difficult to see how the boat can use this water without grounding her bow in front of the defendants' dock, except at, or nearly at, high tide, the rise and fall of which is $3\frac{1}{2}$ or 4 feet. The plaintiffs sometimes land their boat at the end of their pier, and unload from a gangplank at the after gangway. No reason is shown why they may not unload from the forward gangway; but, even when they use the after gangway, the gangplank is 10 or 12 feet from the lower line of their pier, and there does not seem to be any necessity for lapping the defendants' dock, as the lower line of that dock is 78 feet distant from the gangway, about four-sevenths of the length of the boat.

The learned judge at special term states in his opinion that "it would be very difficult at all times, and impossible many times, to bring the plaintiffs' boat to her dock without running her bow about fifty feet in front of the dock of the defendants." No such claim is made in the plaintiffs' papers, and, as this would bring the stern of the boat above the lower line of the plaintiffs' dock, we are not able to agree with that part of the opinion. As the addition laid out on the diagram leaves a water space of fifteen feet above the

43 N.Y.S.—59

lower line of the defendants' dock, and as the plaintiffs only claim that they lap the defendants' dock about 10 feet, it is difficult to see how the new structure will interfere with their landing. Nor does it appear why they may not make their landing in their own slip in an oblique direction, or from the north with the bow heading down the river, as is sometimes done.

The grant to the plaintiffs' assignors of lands under water by the commissioner of the land office was issued in 1873, and was "for the purposes of commerce of our state and for no other purpose," and was conditioned upon the erection of a dock within five years. The dock appears to have been built in its present shape shortly after the issuing of the grant. The original grant to the defendants or their grantors is not in evidence, but it appears that their dock was built about 1876, and it may be assumed that they also had a grant. In 1893 the defendants obtained another grant "for the beneficial enjoyment." This grant extends about 75 feet beyond the end of the present docks. There is a difference between these two classes of grants,—that for purposes of commerce is limited upon the erection of a dock within the named period; that for beneficial enjoyment contains no such provision, and is apparently perpetual, and authorizes them to construct such dock out to the exterior line of the grant as is necessary to beneficial enjoyment. When the plaintiffs' dock was erected under their grant it may be assumed that the grant of lands under water in front of their upland became perpetual, but I cannot see that the plaintiffs acquired any exclusive right in the waters beyond a line running at right angles to their own shore, or to the exclusive navigation of any adjacent waters. If any distinction is to be drawn between the grant to the plaintiffs in 1873 and the grant to the defendants in 1893, it would seem, at least, that the defendants' grant was not inferior to that of the plaintiffs. Both parties built their docks to the same distance into the river, and thus acquired rights, but the defendants have now obtained an additional grant under which they claim the right to build their proposed dock. Ice Co. v. Shultz, 116 N. Y. 382, 22 N. E. 564, was a case where a grant had been given to the plaintiff's assignor, who had erected a dock below high-water mark, and subsequently obtained a grant of the lands under water in front of his upland. Later the defendants obtained a grant for beneficial enjoyment of lands under water in front of their premises which lay to the south of the plaintiff's dock. The plaintiff had been in the habit of cutting ice in a cove south of its dock, and conveying it through a canal in the ice, and over the lands under water covered by the grant to defendants, upon which the defendants commenced the construction of a dike, wholly upon their own lands, the erection of which would prevent the plaintiff's towing ice through its canal; and the court held that the plaintiff acquired no more than the lands under water in front of its upland, the lateral limits of which were perpendicular to the shore, and that as the easement claimed on defendants' lands could not be acquired by presumption, even assuming that defendants'

dike constituted a purpresture or a nuisance, the plaintiff could not maintain an action for its abatement.

The plaintiffs contend that the act of congress familiarly known as the "River and Harbor Act" (25 Stat. 425, amended 26 Stat. 454, § 7) prohibits the erection of any pier, wharf, breakwater, or structure in any navigable waters of the United States, where no harbor lines are established, in such a manner as to obstruct or impair navigation, commerce, or anchorage of said waters, without the permission of the secretary of war. It is evident that the statute only prohibits the erection of a dock where it obstructs or impairs navigation, and this is one of the questions of fact which is presented in the present action. And we do not find testimony sufficient to hold that the proposed structure will obstruct or impair navigation. In support of his contention the plaintiffs' counsel cites the case of Railroad Co. v. Backus, 46 Fed. 211, decided in the United States circuit court, where Judge Jackson, in an action brought by an adjoining ferry company, enjoined the extension of a wharf 25 feet into the Detroit river, to a point where the depth of water was 26 feet, and where it may be assumed that the largest vessels were using the waters, and where the channel was comparatively narrow. This, however, presents a very different case from the present one, where the waters are seldom traversed, and then only by vessels of small capacity, and where it is shown that the proposed structure will be no obstruction to general navigation. One rule might well apply to the former, and another rule to the latter case, when the rights of the public are considered. It is not shown here that there is any considerable use of the waters; indeed, their use seems to be confined chiefly to the vessels of the parties to this action. Judge Jackson also says that the building of the proposed dock would prevent the crossing of navigable waters by the ferryboats in entering and leaving their slip. This action differs so materially from the case at bar that it does not seem to assist our conclusion. This court at the present term, in the case of City of Brooklyn v. Mackay, 42 N. Y. Supp. 1063, following the case of Wetmore v. Gaslight Co., 42 N. Y. 384, and Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. 654, held that the owner of the upland on a navigable stream had the right to construct a proper pier or wharf for his own use and that of the public, even though he had not obtained from the state a grant of the land under water. We see no reason why the same rule does not equally pertain to the rights of the United States. It is not necessary for us to decide whether the secretary of war could prevent the construction of the dock in question, but, until action for that purpose is instituted, no good reason is shown why the court should enjoin the construction of the dock in question, and thus prevent the defendants' beneficial enjoyment of their property, at the suit of, and for the benefit of, the owners of an adjacent pier, where the papers and evidence show that the interference with the landing of their boat is shadowy and unsubstantial, even if the exclusive use as claimed found any authority in law.

The judgment is reversed, with costs to abide event. All concur.

CULLEN, J. (concurring). Under the English law, a littoral owner had a right of access to the adjacent waters, the same as to a highway, but it was only a right of access, and he could erect no pier, wharf, or other structure in the water without the consent of the crown. Gould, Waters, § 167; Black's Pom. Water Rights, § 250. In this country it has generally been held that the upland owner has the additional right of constructing a proper pier or landing for the use of himself and public, subject to the general regulations prescribed by the state or the United States (Yates v. Milwaukee, 10 Wall. 497); and since the decision in Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. 654, that is the rule in this state. But though the owner of adjacent upland has the right of access to the river, and also the right to construct a proper pier therein, he has no easement or interest in the lands under water in front of the adjacent proprietors. The riparian right of access, so far as it is a property right incident to the ownership of the upland, is strictly a right of access by the front. It is said in Gould on Waters (section 153):

"The right of unobstructed access is also limited to the front of the land, and does not include the right, if the riparian owner fills out his entire frontage, to have the docks or water spaces on either side kept open in order that he may have access to his wharf."

In Gray v. Bartlett, 20 Pick. 186, it was held that the erection of a pier did not draw after it the exclusive right to use the open space adjoining as a dock for vessels at the wharf to lie in. In Bond v. Wool, 107 N. C. 139, 12 S. E. 28, it was held that the defendant had a right to build a wharf or landing on his own water front, though it cut off the side approach to the plaintiff's landing. In Clark v. Peckham, 10 R. I. 35, it was said:

"So far as concerns the front of his land, the riparian owner has the undoubted right of access to it. * * * So long as the dock [vacant space between piers] is not filled in by the owner of the bank, * * * he has a right of access to the sides of his wharf. He has, indeed, no exclusive right to the use of the water opposite the adjoining land; he has it in common with the rest of the world."

A contrary rule would give the riparian owner who might first erect a pier the power to prevent adjacent owners exercising their rights, by keeping the water clear for access to the sides of his pier, or limit such rights by preventing the adjacent proprietors from making piers extending any further into the stream than that first erected. In the harbor of New York, and I presume generally in ports with much commerce, pier lines and bulkhead lines have been established under the authority both of the state and federal governments. The state has also prescribed that piers shall not be built out in that harbor within a specified distance from other piers. Under this legislation, the owner of a pier which extends to the pier line obtains a certain protection against too great propinquity of other structures. But, in the absence of such legislation, one must so build his pier with reference to his ownership of the upland as to secure himself from interference by the structures of adjacent proprietors.

Though the plaintiffs have no easement in the lands under water owned by the defendants, if the structure sought to be erected by

the defendants is unlawful and specially injurious to the plaintiffs, they, doubtless, may maintain an action for its removal. But, to be a nuisance, the erection of a wharf in tide waters must injure navigation. Thornton v. Grant, 10 R. I. 477. I think the evidence does not show that the defendants' pier obstructs navigation. The channel, if it may be called a channel, on which the pier terminates, does not run beyond the pier, nor is there shown any navigation beyond that point. It does not obstruct the plaintiffs' vessels in reaching their pier, for it lies without the route of the vessels. The most injurious effect which the plaintiffs claim that the defendants' pier may have is to prevent the facility and ease with which the vessels may be warped along and moored to the side of their pier. This we do not think is a right of navigation, but a question of the right of access to the pier, which, as has already been shown, does not exist in favor of the plaintiffs over defendants' lands. The only action the state has taken on the subject of pier lines at this point on the river is that of the land commissioners in fixing the outer boundaries of the land under water, which the state has conveyed to the upland proprietors. The pier intended to be extended by the defendants lies entirely within the limits of the grant to them. Therefore, so far as regulations of the state are concerned, the defendants' threatened action is entirely authorized.

Nor do we think the federal statute (25 Stat. 425) renders the defendants' work illegal. By that statute it is provided "that it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty or structure of any kind outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the secretary of war, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce or anchorage of said waters." This section does not render any pier that may be erected in navigable waters, without the permission of the secretary of war, unlawful, but only such a pier as obstructs or impairs navigation, commerce, or anchorage of said waters. As already stated, we think it has not been shown that the pier in question affects navigation. In this respect it differs from the case of Railway Co. v. Backus, 46 Fed. 211, and there is this further distinction between the cases, as I gather from the opinion of Justice Jackson: The city of Detroit, in the case cited, had established a pier line, and I infer that the defendants' pier was sought to be extended beyond that line, for the opinion of the learned judge states that "the defendants in this case, therefore, stand alone upon their right as riparian proprietors, which they insist gives them the right to extent their present dock frontage twenty-five feet out in the river." In the present case the defendants have all the authority that the state can give them.

The judgment appealed from should be reversed, and a new trial granted, costs to abide the event.