WHITE, GRATWICK & MITCHELL, INC., Plaintiff, *v.* THE EMPIRE
ENGINEERING COMPANY, INC., Defendant.*

Supreme Court, Erie County, October 1, 1923.

Waters and watercourses — riparian owners — action to restrain defendant
from construction of such piers in Niagara river as will interfere with
navigation and impair means of access to plaintiff's docks — riparian
owner's right of access to navigable part of stream is limited to right of
erection of piers out to line of navigability — construction of piers so
as to interfere with navigability of stream may be enjoined or abated
as public nuisance — establishment of harbor line by Secretary of War
approximately 400 feet from shore and outside 60-foot channel used
to reach plaintiff's docks does not give defendant right to erect piers
out to said harbor line without affirmative action of Congress under
River and Harbor Appropriations Act (30 U. S. Stat. at Large, 1151,
chap. 425), §§ 9, 10, 11 — grant by State Board of Land Commissioners,
pursuant to Public Lands Law, of title to lands under water to defend-
ant's predecessor in title does not confer right to erect such structures
in navigable waters as will violate Federal prohibition against impairing
navigability of such stream — plaintiff not barred from maintenance
of action to restrain erection of piers by reason of action of Land
Commissioners — Public Lands Law, § 75, subd. 5, applied — plaintiff
entitled to injunctive relief.

While a riparian owner may build wharves and piers from the upland out to the
navigable part of the stream, and has the right of access to the navigable
portion of the stream as an incident to his ownership of said upland, the
erection of piers, bulkheads, wharves or other structures into or beyond the
navigable portion of the stream so as to interfere with the navigability of the
stream or the means of access of abutting riparian owners to their property,
is a public nuisance which may be restrained or abated.

Accordingly, the defendant, the owner of property abutting plaintiff's lands and
fronting on the Niagara river and all the lands under water in front of said
premises, should be enjoined from the erection of piers extending from the
shore out into the said river over the land under water, title to which is claimed
by the defendant by reason of a grant from the State Board of Land Commis-
sioners, where it appears that the piers, if constructed, will cross a sixty-foot
channel through which navigation must pass in order to reach plaintiff's docks,
and, owing to the inadequate depth of the water outside said channel toward
the center of the river, will prevent access to plaintiff's property and destroy
the value of its docks in use for more than forty years.

The establishment of a harbor line by the Secretary of War, running parallel with
the shore of said river and approximately 400 feet from it, and outside of the
60-foot channel, does not give the defendant the right to erect piers or bulk-
heads out to said harbor line in the absence of *affirmative action of Congress,*
pursuant to the provisions of the River and Harbor Appropriations Act (30
U. S. Stat. at Large, 1151, chap. 425), §§ 9, 10, 11.

Nor does a grant to defendant's predecessor in title by the State Board of Land
Commissioners, pursuant to the Public Lands Law, conveying the lands under

* Affd., 211 App. Div. 834; 240 N. Y. 648.

water in front of defendant's property from the shore to the government harbor line, confer upon the defendant the right to erect said piers across the navigable portion of the said river, since the State cannot confer a right to build structures in navigable waters of the United States which will violate the statutory prohibitions against impairing the navigability of such streams, in the absence of *affirmative action of Congress* permitting said structures.

Moreover, the grant by the State Board of Land Commissioners by its terms does not give the defendant the right to build said piers, but simply imposes a condition that in case the grantee shall fail to erect and maintain structures of a substantial character upon said lands, said grant shall become null and void.

Under subdivision 5 of section 75 of the Public Lands Law no action of the State Board of Land Commissioners may take away or impair the rights of the plaintiff to maintain and protect the navigability of the Niagara river and the right of access to its property.

Action to restrain the defendant from constructing piers in the Niagara river which will interfere with navigation.

*Brown, Ely & Richards* [*John B. Richards* and *David S. Jackson* of counsel], for the plaintiff.

*Moot, Sprague, Brownell & Marcy* [*S. Fay Carr* of counsel], for the defendant.

Charles B. Wheeler, Official Referee:

The plaintiff is lessee of property on the Niagara river between the cities of North Tonawanda and Niagara Falls, having a frontage of about 900 feet. This frontage is docked, and for years has been used by the plaintiff and its predecessors for the purpose of discharging cargoes of lumber from vessels coming down the Great Lakes, and going down the Niagara river to the plaintiff's wharf, where it is shipped by rail to various points east of the Tonawandas. The plaintiff not only owns large mills for producing lumber on the Georgian bay, but also receives and handles lumber consigned to it by other producers and shippers.

The business thus done by the plaintiff is one of the largest of the kind in the State. Adjoining the property of the plaintiff on the south, and between it and the city of North Tonawanda, is property owned by the defendant having a frontage on the Niagara river of about 600 feet. Adjoining the defendant's property on the south lies other property of the plaintiff having a river frontage of about 600 feet. This is docked and also used by the plaintiff for receiving and handling lumber from vessels navigating the Great Lakes.

Steamboats engaged in the lumber business when laden draw from fourteen to sixteen feet of water, and tow barges from thirteen to fifteen or sixteen feet, the average depth for barges being about fourteen or fourteen and one-half feet, and for steamboats about fifteen and one-half feet.

In order to reach the property of the plaintiff first described, vessels laden with lumber are required to proceed down and through a channel in the river some sixty feet in width and having a depth of some seventeen feet of water. This channel lies in the river only a comparatively short distance out from the shore line. Outside of this sixty-foot channel and toward the center of the river the depth of the water decreases, and vessels drawing the average depth cannot navigate the river without running aground. As a consequence for more than thirty years their movements have been confined to the sixty-foot channel mentioned.

The United States government on about November 17, 1899, established what is known as the harbor line, which runs practically parallel with the shore, but about 400 feet from it. It will thus be seen that the 60-foot channel lies between the shore and the so-called harbor line.

In 1920 one Frederick Barnheisel, then being the owner of the property now owned by the defendant, the Empire Engineering Company, made application to the Commissioners of the Land Office of the State of New York for a grant of land under water in the Niagara river in front of said property. A remonstrance against said grant was made by Frederick C. Gratwick and Mildred G. Crane and also by this plaintiff. Notwithstanding such remonstrance the grant was ordered by the Land Commissioners and was followed by letters patent from the State conveying the lands under water from the shore to the government harbor line. The grant, however, was upon the express condition that at the end of five years the lands under water conveyed should be improved by filling in the lands described; or " By building and maintaining thereon a bulkhead or retaining structure and filling in or back of same," or " By erecting and maintaining on said lands upon piles or other supports a building or buildings, a structure or structures, or a pier or piers, of a substantial character," etc.

In case of a failure to so improve the lands granted the grant was to become null and void.

The Empire Engineering Company, the grantee of Barnheisel, and the defendant in this action, has prepared plans for the construction of piers running from the shore out into the river over the land under water granted by the State. These piers, if constructed, will run directly across the sixty-foot channel above referred to. It is conceded that unless restrained the defendant will erect these piers. It will be thus seen that, if constructed as proposed, the piers will so interfere with the navigation of the Niagara river at this point as to prevent vessels of the type

4

**50** White, Gratwick & Mitchell, Inc., *v.* Empire E. Co. Inc.

Supreme Court, October, 1923. [Vol. 125

and character in common use approaching the docks and wharves of the plaintiff, and practically destroy their value for the purposes for which they have been used for forty years or more.

The plaintiff brings this action to restrain such erections, and the questions presented are whether under the circumstances the action may be maintained. The disposition of these questions involves a consideration of the powers and authority of the Federal and State governments, and the rights of the parties as riparian owners.

The main question in the disposition of this case is whether the defendant as the abutting and adjacent owner of property fronting on the Niagara river and of the lands under water in front of its premises may by the construction of piers over such lands extending into the river, so impair the means of access to the plaintiff's property by impairing navigation to it, as to destroy its value for dock purposes.

This right of access to lands bounded on a navigable stream is a property right, universally recognized by the law of the land, and emphasized by innumerable decisions of the courts of this and other States. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Sage* v. *Mayor*, 154 id. 61, 73; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 id. 75; *Hedges* v. *West Shore R. R. Co.*, 80 Hun, 310; *People ex rel. Cornwall* v. *Woodruff*, 30 App. Div. 43, 47; *People* v. *Mould*, 37 id. 35; *Illinois Central R. R. Co.* v. *Illinois*, 146 U. S. 387, 448; *Lewis* v. *Johnson*, 76 Fed. 476; *Paine Lumber Co.* v. *United States*, 55 id. 854; *Yates* v. *Milwaukee*, 77 U. S. [10 Wall.] 497; *Grand Trunk R. Co.* v. *Backus*, 46 Fed. 211.)

A riparian owner has the right to build wharves and piers from the upland out to the navigable part of the stream, but there the right ends, and he must go no farther. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Yates* v. *Milwaukee*, 10 Wall. 497.)

In other words, the riparian owner has the right of access to the navigable portion of a stream as an incident to his ownership of the upland. The lands under water are subservient to this right of the riparian owner, and structures to enable him to reach the navigable portion of a stream are not nuisances or purprestures.

Where, however, such structure extends into or beyond the navigable part of a stream it then invades the public right of navigation, and becomes illegal and a public nuisance. In such cases where a stream is navigable it becomes a public highway, and the title to the banks and bed of a stream, whether vested in the State or in private individuals, is subject to the paramount easement of the public for purposes of navigation. (*Matter of Commissioners of State Reservation*, 37 Hun, 537; *Morgan* v. *King*, 35 N. Y.

454; *American Ice Co.* v. *City of New York,* 217 id. 402, 405, 406; *Appleby* v. *City of New York,* 235 id. 351, 360.)

When, therefore, piers, bulkheads or other structures are erected which interfere with the navigability of a stream, or the access of abutting riparian owners to their property, such nuisances may be abated at the suit of public officials or of private parties injured by their existence. (*Rumsey* v. *N. Y. & N. E. R. R. Co., supra.*)

The citation of some authorities will illustrate the rule.

A very important case is that of *Grand Trunk R. Co.* v. *Backus* (*supra*) where the facts are quite similar to those of the case in hand. That was an action by the plaintiffs, who were owners of lands fronting on the Detroit river, to restrain the defendants, who owned adjoining property, from extending a pier into the river so as to interfere with the navigability of the stream, thereby causing serious damage to the plaintiffs. The injunction was granted, and the court said that riparian owners may erect docks and wharves in such waters "*out to the line of their navigability*" (Citing *Dutton* v. *Strong,* 1 Black, 23, 32), but held that where such docks or wharves extend beyond the line of navigability so as to obstruct or in any wise impede the navigation of the public highway or stream over which the right of the public is paramount it creates a public nuisance, which persons specially injured thereby are entitled to abate or enjoin. (Citing the case of *The Daniel Ball,* 10 Wall. 557, defining what constitutes navigability, and also the case of *Atlee* v. *Packet Co.,* 21 id. 389, where an adjacent owner without express authority of law extended a pier into the Mississippi river, and the pier was struck by a navigating vessel and the right to maintain an action for damages was sustained.)

In the case of *Rumsey* v. *N. Y. & N. E. R. R. Co.* (*supra*) it was held a railroad although acting under legislative authority had no right to so construct its railroad as to deprive a landowner of access to the navigable part of a stream upon which the land abutted.

So, too, in *Fulton L., H. & P. Co.* v. *State* (65 Misc. 263; affd., 138 App. Div. 931; affd., 200 N. Y. 400) it was held that the State could not appropriate the waters of a navigable stream so as to impair the rights of riparian owners without first making compensation for the damage done.

In *Yates* v. *Milwaukee* (*supra*), in speaking of these riparian rights, the court said: "This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired." To the same effect are the cases of *Sage* v. *Mayor* (154 N. Y. 61, 78) and of *Illinois Central R. R. Co.* v. *Illinois* (146 U. S. 387, 448).

In *People ex rel. Cornwall* v. *Woodruff* (30 App. Div. 43, 47;

Supreme Court, October, 1923. [Vol. 125

affd., 157 N. Y. 709) the court said: "The rights of a riparian proprietor bounded upon a navigable stream are of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier, for his own use or for the use of the public."

In the case of *People v. Mould* (37 App. Div. 35) the question presented was whether, when a riparian owner had exercised his right of building a pier in shoal waters in front of his premises for the lawful purpose of reaching the navigable part of a stream, in no way obstructing navigation, the State could maintain an action to compel its removal, and it was held it could not.

In its opinion the court laid stress on the fact that the pier did not interfere with navigation, that a riparian owner had the right of access to the navigable part of the river. The court, however, recognized the rule that the right of access to the channel and building of piers for that purpose is subject to the "Superior right of the State as trustee for the People at large," and further said: "*If the pier interfered with navigation, or with any public right or interest, or if shown to be an actual nuisance, an action to compel its removal could have been maintained.*"

In *Jenks v. Miller* (14 App. Div. 474) the action was to enjoin the further extension of a pier into a river on the ground that such an extension would interfere with boats landing at the plaintiff's pier, also extending into the river, there being a slip between the two piers. It was held that on the evidence presented the action could not be maintained, because the testimony was insufficient to support a holding that the structure complained of would "obstruct or *impair navigation*." The court, therefore, distinguished the *Jenks* case from that of *Grand Trunk R. Co. v. Backus* (46 Fed. 211, *supra*), and said that therein: "It may be assumed that the largest vessels were using the waters and   *   *   * the channel was comparatively narrow." This the court said presented a very different case from that under consideration when the waters were seldom traversed, and then only by vessels of small capacity, "and where it is shown that the proposed structure will be no obstruction to general navigation."

Mr. Justice Cullen in his opinion said: "Though the plaintiffs have no easement in the lands under water owned by the defendants, if the structure sought to be erected by the defendants is unlawful and especially injurious to the plaintiffs, they, doubtless, may maintain an action for its removal. But to be a nuisance, the erection of a wharf in tide waters must injure navigation." (*Thornton v. Grant*, 10 R. I. 477.)

On this branch of the case now under consideration we may rest

after citing the case of *Lyon* v. *Fishmongers' Co.* (L. R. 1 App. Cas. 662). The appellant was owner of land on the north bank of the Thames known as Lyon's Wharf, the whole of the southern side of which fronted the river. At the western extremity of this frontage there was an inlet which extended about forty feet to the northward. At the end or bottom of this inlet, called Winckworth's Hole, stood the wharf of the Fishmongers' Company. Appellant's property enjoyed the advantage of a double river frontage; to the south on the main river, to the west on Winckworth's Hole; Lyon's Wharf had enjoyed both these means of communicating with the river for an indefinite period of time. The Thames Conservancy Act created conservators to grant to owners of land adjoining the river a license to make any dock, wharf or embankment in front of his land upon certain conditions. The Fishmongers' Company for consideration paid obtained a license to make an embankment in front of their wharf up to the main line of the river, which would have resulted in closing Winckworth's Hole and putting an end to the use the appellant made of such hole.

The Lord Chancellor (Lord CAIRNS) in disposing of the case said: "Admitting * * * that a license * * * would be a perfect justification for an embankment made by a riparian owner in front of his own land, so far as it merely affected the public right of navigation, it would appear to be, *à priori*, in the very highest degree improbable that an act of Parliament could intend * * * to authorize the conservators to permit one riparian owner to affect injuriously the land of another riparian owner, in consideration of a payment to be made, not to the person injured, but to the conservators themselves. * * *

" Unquestionably the owner of a wharf on the river bank has, like every other subject of the realm, the right of navigating the river as one of the public. This, however, is not a right coming to him *quâ* [as an] owner or occupier of any lands on the bank, nor is it a right which, *per se*, he enjoys in a manner different from any other member of the public. But when this right of navigation is connected with an exclusive access to and from a particular wharf, it assumes a very different character. It ceases to be a right held in common with the rest of the public, for other members of the public have no access to or from the river at the particular place; and it becomes a form of enjoyment of the land, and of the river in connection with the land, the disturbance of which may be vindicated in damages by an action, or restrained by an injunction. * * * The taking away of river frontage of a wharf, or the raising of an impediment along the frontage, interrupting the access between the wharf and the river, may be an injury to the

public right of navigation; but it is not the less an injury to the owner of the wharf, which, in the absence of any Parliamentary authority, would be compensated by damages, or altogether prevented."

These and other cases which might be cited show that at common law the plaintiff in this action has a good and perfect cause of action to enjoin the defendant from the building of the proposed piers in the Niagara river, unless that right has been taken away or in some way impaired or destroyed by the action of the State authorities or of the Federal government by the grant to the defendant's predecessor in title of the land under water, or by the establishment of the harbor line by the Secretary of War some 400 feet from the shore, and outside the 60-foot channel used in reaching the plaintiff's docks.

It becomes, therefore, the duty of the court to consider and discuss the questions thus presented.

At the very outset it must be borne in mind that the Niagara river is a large navigable stream constituting a boundary between the United States and the Dominion of Canada; and from its nature is one over which the jurisdiction and control of the United States government is paramount and superior to any which may be exercised by the State of New York.

While the State may own and grant the fee or lands under the waters of the river, nevertheless it can do nothing which will impair the rights of the Federal government in its control of its waters in the interest of navigation. (*Appleby* v. *City of New York*, 235 N. Y. 351, 361; *Montgomery* v. *Portland*, 190 U. S. 89; *Matter of Public Service Commission* [*Montague St.*], 224 N. Y. 211.)

The defendant contends in substance that the establishment and location of the harbor line by the Secretary of War on November 17, 1899, conferred upon the upland owners the right to build piers and wharves out to that line, and that the defendant is within its rights in the erection of the piers proposed.

The plaintiff challenges this contention and stands on the Federal statutes, claiming such structures are positively forbidden where they interfere as they do in this case with the navigability of the river. The plaintiff stands on the provisions of the River and Harbor Appropriations Act of March 3, 1899 (30 U. S. Stat. at Large, 1151, chap. 425, §§ 9, 10, 11), which provide:

Sec. 9 (U. S. Comp. Stat. § 9971). " It shall not be lawful to construct or commence the construction of any *bridge, dam, dike, or causeway* over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures

shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided,* That such structures may be built under authority of the Legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War."

Sec. 10 (U. S. Comp. Stat. § 9910). " *That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited;* and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning of same."

Sec. 11 (U. S. Comp. Stat. § 9912). " That where it is made manifest to the Secretary of War that the establishment of harbor lines it essential to the preservation and protection of harbors he may, and is hereby, authorized to cause such lines to be established, *beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made except under such regulations* as may be prescribed from time to time by him: *Provided,* That whenever the Secretary of War grants to any person or persons permission to extend piers, wharves, bulkheads, or other works, or to make deposits in any tidal harbor or river of the United States beyond any harbor lines established under authority of the United States, he shall cause to be ascertained the amount of tide water displaced by any such structure or by any such deposits, and he shall, if he

**56** White, Gratwick & Mitchell, Inc., *v.* Empire E. Co., Inc.

Supreme Court, October, 1923. [Vol. 125

deem it necessary, require the parties to whom the permission is given to make compensation for such displacement either by excavating in some part of the harbor, including tidewater channels between high and low water mark, to such an extent as to create a basin for as much tide water as may be displaced by such structure or by such deposits, or in any other mode that may be satisfactory to him."

It is not contended in this case that any act of Congress has been passed authorizing the erection of the piers in question nor has there been any approval by the Secretary of War of plans for their construction.

The language of section 10 of the act of 1899 is plain and explicit. It declares *" That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited."* No language could be broader in its terms, and covers the situation presented in this case. It is contended, however, by the defendant that the section 11 following modifies and limits the operation, force and effect of section 10.

Section 11 reads: *" That where it is made manifest to the Secretary of War that the establishment of harbor lines is essential to the preservation and protection of harbors he may, and is hereby, authorized to cause such lines to be established, beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him."*

It is argued that this provision authorizes the Secretary of War by the establishment of harbor lines, at least by implication, to permit the building of piers and bulkheads out to the harbor line even though such piers may obstruct navigation, and that section 11 is a delegation of such authority to the Secretary of War.

The answer we think to this contention is that such a construction of the statute would negative the plain language and intent of section 10. If such a construction is to prevail then there was no necessity of incorporating into the statute the provisions of section 10 forbidding obstructions to navigation *" not affirmatively authorized by Congress."*

We do not think it was the intention of Congress to expressly forbid the doing of a certain thing, and reserving to itself the right to say when such a thing may be done, and in the very same statute delegate it to others. The prohibition against obstructing navigation, unless *" affirmatively authorized by Congress,"* is a prohibition upon the Secretary of War as much as upon private persons or State Legislatures.

It is to be noted that there must be no obstruction to navigation unless *" affirmatively* authorized by Congress."

In construing the statute full force and effect must be given to the word "*affirmatively.*" This means something more than authority by implication.

The argument of the defendant in substance is that inasmuch as the Secretary of War may establish harbor lines "*beyond which no piers, wharves, bulkheads, or other works shall be extended,*" that, therefore, within harbor lines by implication such structures may be built even though obstructing navigation of ports of a stream. The argument is predicated entirely on authority by implication rather than by an affirmative or express language. In the case of *Hubbard* v. *Fort* (188 Fed. 987) this subject was discussed and it was there said: "What is affirmative authorization? Affirmative is the antithesis of negative.   *   *   *   In view of the context, the word 'affirmatively' was legislatively used to distinguish the two kinds of authority referred to, and to make it plain that the initial authorization to create an obstruction was not to rest on *implied,* but express — affirmative — congressional authority."

In the *Hubbard* case the Secretary of War had issued a license purporting to authorize the Hudson County Water Company to lay two water mains from Bayonne, N. J., to Staten Island, N. Y., across the Kill von Kull for interstate transportation of water. The court considered at length the provisions of the act of March 3, 1899, and of the previous acts of Congress on the subject, and (at p. 994) quoted from the opinion of Vice Chancellor WALKER in *Wilson* v. *Hudson County Water Co.* (76 N. J. Eq. 543) wherein it is stated: "In this connection it may be observed that the tenth section of the River and Harbor act [of 1899] does not provide that it shall be lawful for the Secretary of War to authorize the excavation of land in the channel of any navigable waters of the United States, but only that it shall not be lawful to do the work without the authorization of the Secretary, had before beginning the work. The section as worded *clearly contemplates that the consent of the Secretary shall merely be permissive of the doing of work for which authority already exists.*"

On page 997 it is further said: "Authority to excavate and lay a pipe line in the bed of the Kill von Kull is one thing, and authority relating to the time when and the plans in conformity to which the work is to be done is another. The Secretary of War's authorization is *supervisory, and relates to the character and performance of the work, and not the directing or authorizing it to be done in the first instance.*

"Section 9 clearly evinces that Congress intended to keep to itself the initial authorization of the crossing of interstate waters

**58** White, Gratwick & Mitchell, Inc., v. Empire E. Co., Inc.

Supreme Court, October, 1923.                    [Vol. 125

by bridges, dams, etc., and section 10 affords no presumption that in respect to the structures and works specifically referred to therein it intended to delegate such initial authorization to the Secretary of War. The first part of such section unambiguously embraces them, and the remainder does not disclose an intent to effect an exception."

At page 999 the court sums up its construction of the statute: " A present reading of the law in the light of the history of its enactment clearly evinces to my mind a legislative purpose to require affirmative action on the part of Congress before such a crossing of interstate streams contemplated by complainants in this suit shall be permitted, and that only when such Congressional action shall have been taken can the powers delegated to the Secretary of War be put into operation."

An important case bearing on the question under discussion is that of *Montgomery* v. *Portland* (190 U. S. 89).

In that case the Secretary of War had established a harbor line farther out than the line fixed by the common council of the city. Montgomery claimed the right to build his wharves to the Secretary of War's harbor line, and commenced construction beyond the local line, which was declared by the council to interfere with navigation, and suit was brought to enjoin the extension.

The action was commenced prior to the amendment to the River and Harbor Appropriations Act of March 3, 1899, and under the statute then in force it was not necessary to obtain affirmative action by Congress in order to obstruct a navigable stream, but the language of the then existing statute granting authority to the Secretary of War to establish harbor lines in section 12 of the act of August 11, 1888, was practically the same as that contained in section 11 of the act of March 3, 1899.

The Supreme Court of the United States held that Montgomery had no right to extend his wharf to the harbor line established by the Secretary of War, on the ground that under the existing legislation the assent of the Secretary of War was not a grant of power to erect a structure in navigable waters.

In the case of *Phœnix Construction Co.* v. *Cornell Steamboat Co.* (210 N. Y. 113) the plaintiff was under contract with the board of water supply of the city of New York to make boring tests in the bottom of the Hudson river in order to determine at what place an aqueduct or tunnel should be constructed, and for the purpose had established plants in the river consisting of scows, platforms, drills, pipes, etc., which were struck by boats of the defendant and injured, and hence a suit for damages.

The defendant by way of defense claimed the plaintiff was

unlawfully interfering with navigation of the river under the act of March 3, 1899.

The court held that the obstructions, such as they were, were but of a temporary character and not permanent; and, therefore, the act of 1899 should not be construed to apply to constructions of that nature.

The court in its opinion said: " If the case is one which called for permission from the Federal authorities, it, rather, falls within those provisions of section 10, which leave the doing of any work modifying the capacity of channels in navigable waters to the recommendation of the chief of engineers and the authorization, thereupon, of the Secretary of War. The prohibition against ' the creation of any obstruction, not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States ' does not apply to the case; inasmuch as, within the just and reasonable construction to be given to the language, the plaintiff was not engaged in the ' creation ' of any obstruction to the navigability of the river. *The intent of the statute was against the construction of structures of a more, or less, permanent nature and of the description of those particularized, unless authorized as prescribed.* The plaintiff was executing a contract to test by borings the nature of the bed of the river, through which the construction of the aqueduct, or tunnel, was contemplated, and the plant used for the purpose constituted but a temporary obstruction of the river, which, upon execution of its purpose, would be removed. The intendment of the statute should not be so strictly construed as to be unfavorable to the *temporary* use of navigable channels in furtherance of public improvements within a State; when the permission of the proper officials of the United States government, generally, has been obtained."

We are justified in inferring that had the obstruction been a permanent instead of a temporary one, the court would have held that it would have been illegal for want of proper authorization by Congress as required by section 10. We think the cases cited fully uphold the view that nothing but the affirmative action of Congress would justify the defendant in building its contemplated piers across the channel of the Niagara river, and thus destroying its navigability and the access to the plaintiff's docks, for such would be the effect of such a construction.

The right to construct piers and wharves in navigable waters must be confined to shoal waters and terminate at the point of navigability. (*Dutton* v. *Strong,* 1 Black, 23.)

The State acting through its Board of Land Commissioners has the undoubted right to grant riparian owners land under water, and

60  WHITE, GRATWICK & MITCHELL, INC., *v.* EMPIRE E. CO., INC.

Supreme Court, October, 1923.                    [Vol. 125

may with such grants, if it see fit, couple conditions which if unfulfilled work forfeiture of the title conveyed.  But the State cannot confer a right to build structures in navigable waters of the United States which will violate the Federal statutes against impairing the navigability of such streams.

This court is not called upon to pronounce the grant made to Barnheisel void and illegal.  It stands and should stand for what it is worth.  But we do hold that the defendant has no right or authority without affirmative action of Congress to do anything in meeting the conditions of the land grant which will in any way interfere with the navigability of the Niagara river at this point.  This brings the referee to the consideration of the claim made by the defendant that the action of the State Board of Land Commissioners in granting to Barnheisel the land under water in front of his property over the remonstrance of the plaintiff is such an adjudication that the plaintiff is barred from maintaining this action.  We think the defendant's contention in this particular is not well taken.

Section 76 of the Public Lands Law provides for the publication of notice of an application for a grant of land under water.  After such notice the plaintiff did appear and file a remonstrance, but notwithstanding the Land Board made the grant.  We do not think the action of the Board in any way impaired the right of the plaintiff to maintain this action.  Subdivision 5 of section 75 of the act expressly provides: " But private rights or rights of property of individuals, if any, of any nature or description, shall not be taken away nor impeded without due process of law."

If this clause means anything it means that no action of the Land Board may take away or impair the rights of the plaintiff to maintain and protect the navigability of the Niagara river and the right of access to its property.  The Land Board is given authority simply to convey by grant the State's property and rights in the land under water; but the provision cited (§ 75, subd. 5) expressly confines its grant to the State's rights in the land conveyed, and saves and protects as against the operation of the grant all " the private rights or rights of individuals, if any, of *any nature or description.*"

The right of access to its own property and for that purpose to maintain the navigability of the river is a property right of the plaintiff which cannot be taken away and impaired without compensation.  (*People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71, 76; *Matter of City of N. Y.*, 168 id. 134, 142.)

The power to grant land under water so that it may become private property is subject to the paramount right of the public

which it can neither destroy nor abridge. (*People* v. *N. Y. & S. I. F. Co., supra; Matter of City of N. Y., supra.*)

We must assume, therefore, that the Land Board in making the grant to Barnheisel in no way undertook to adjudicate or pass upon the force and effect of its grant as affecting the riparian rights of the plaintiff. If it did, it undertook to pass on questions over which it had no jurisdiction or authority to act, and its action was without authority.

Grants of land under water must be construed if possible as not granting rights in impairment of the rights of navigation. (*People* v. *N. Y. & S. I. F. Co., supra,* 77; *Lewis Blue Point Oyster C. Co.* v. *Briggs,* 198 id. 287, 292; *Shively* v. *Bowlby,* 152 U. S. 1, 10.)

The grant does not in express terms give the grantee the right to build piers across the navigable portion of the Niagara river. The grant simply imposes a condition that in case the grantee shall not do so within a stated time the State may treat its grant as null and void.

It may be possible that within the time stated the defendant may by purchase or compensation and by consent of the proper Federal authorities so acquire and extinguish the plaintiff's rights as to enable it to build the piers in question. Until that, however, is done we are of the opinion the plaintiff may maintain this action to restrain interference in the navigability of the river as means of access to its property.

The plaintiff is not attacking or seeking to impeach the grant made the defendant's predecessor in title. It is simply standing on its rights as a riparian owner whose rights will be injuriously affected in the event the defendant undertakes the building of piers across the channel of the river without first acquiring such rights by proper authority and compensation to it. We are not unmindful of what the Appellate Division has said in its opinion upon the decision of the certiorari proceeding instituted in *People ex rel. Gratwick* v. *Comrs. of Land Office* (202 App. Div. 240) to review the action of the Land Board to the effect that "the Federal government has established the harbor line in front of the premises of the parties here, which harbor line is *presumptively* the line outside of which are the public, navigable waters of the stream and beyond which no piers or wharves may be constructed."

This plaintiff, however, was not a party to that certiorari proceeding and was not heard on the hearing before the Appellate Division.

If there is any such presumption as that stated in the opinion in that case, that presumption has been met and overthrown by the evidence given before the referee in this action. The proof

Surrogate's Court, Albany County, May, 1925.          [Vol. 125

before the referee in this action is that such piers will destroy the navigability of the river for vessels drawing the depth of water needful for vessels of the character employed in the transportation of lumber, and that such vessels cannot use the river outside the so-called harbor line, without grounding. In fact that there is no way of reaching the plaintiff's docks without using the channel inside the harbor line. The defendant offered no evidence to rebut this testimony on the plaintiff's part, and we must accept the plaintiff's claim in this regard as the facts in the case.

As a conclusion of the whole matter we are of the opinion that the plaintiff is entitled to the relief asked. Let findings be prepared in conformity with the views above expressed. The plaintiff is entitled to recover the costs of this action.