EDWARD K. MACRUM and Others, Appellants, *v.* RICHARD W. HAWKINS and Others, Individually and Also as Constituting the Board of Supervisors of the County of Suffolk, and Others, Respondents.*

Second Department, May 3, 1932.

*M. E. Harby,* for the appellants.

*Joseph Steven Frank* [*Guy O. Walser* with him on the brief], for the respondents other than Dennis G. Homan.

* Affg. 141 Misc. 358.

SCUDDER, J. The Suffolk county board of supervisors, consisting of ten members, adopted a resolution on March 31, 1930, by vote of nine to one, creating a county planning board, and designated three of their own members as such planning board.

Thereafter, by a series of resolutions passed by the board of supervisors, by votes of nine to one, and in which the three members of the planning board participated in their capacity as supervisors, provision was made for the appropriation of funds aggregating $5,000,000 to be used for the construction of bridges connecting Shelter island with the mainland of Long island, and for dredging and other public purposes. Separate resolutions were passed specifically providing for the issuing of county bonds, to be respectively issued for the following projects: $3,350,000 for bridges and approaches, $950,000 for dredging, $600,000 for parks and parkways, and $100,000 for Holtsville Tuberculosis Sanitarium.

From time to time the planning board reported to the board of supervisors in relation to such improvements. Thus it is claimed by plaintiffs that the members of the planning board reported to themselves, and that membership on both boards was incompatible.

Plaintiffs, as Suffolk county taxpayers, sue for a declaratory judgment that membership upon the planning board operated to vacate membership in the board of supervisors, and that the proposed bond issue is illegal and void. They also ask for an injunction restraining the issuance of the bonds.

Section 6 of the General Municipal Law provides that "A funded debt shall not be contracted by a municipal corporation * * * unless such ordinance or resolution shall be passed by a two-thirds vote of all the members elected to the board."

If appellants' contention is sustained, then the proceedings taken by the board of supervisors were void, because only six affirmative votes could then be counted. Such a vote would be three-fifths, and not two-thirds, of the total number of supervisors.

A county may establish a regional planning board " to consist of representatives of such county " and they shall receive no compensation as members of such board. (General Municipal Law, § 239-b, as added by Laws of 1925, chap. 539.)

If the offices of supervisor and member of the planning board are incompatible, then the three members of the planning board, by becoming such, in effect resigned their offices as supervisors (*People ex rel. Henry* v. *Nostrand*, 46 N. Y. 375, 381), and the various resolutions adopted by the board of supervisors with their votes are void.

The planning board appears to be no more than a board with power to investigate, report and recommend as to what public improvements in their community will be for the public good. There is no incompatibility in the power of the supervisors to audit the expenditures of three of their members who constitute the planning board. This has been settled in *People ex rel. Board of Suprs. of County of Ulster* v. *City of Kingston* (101 N. Y. 82), where the court said (pp. 94, 95): " It is further objected that the Legislature could not constitute the board of supervisors a board to audit the expenses chargeable against the city — the other party to the appeal — on the ground that thereby it was made a judge in its own cause. The authorities are decisive against the objection."

That membership on a planning board is not generally considered incompatible with the holding of some other public representative office is indicated by various statutes enacted in this State.

A board of park commissioners for a town was compelled to have the supervisor and certain village presidents as members. (Laws of 1907, chap. 711, § 3.) A law relating to city and village planning commissions provided that " Not more than one-third of the members of said commission shall hold any other public office in said city or village." (General Municipal Law, § 234.*)

Laws relating to the city of Syracuse and the Niagara Frontier, and formerly to the city of Rochester (since superseded by local laws), all specifically recognized the desirability of having as members of their respective planning commissions or boards, such public officials as the corporation counsel, city engineer, commissioner of public safety, mayor of cities, and supervisors. (Rochester City Charter [Laws of 1907, chap. 755], § 292, as added by Laws of 1917, chap. 505; superseded by Rochester Local Laws of 1925, No. 4, § 241, as amd. by Rochester Local Laws of 1928, No. 4, and rep. by Rochester Local Laws of 1929, No. 9; Laws of 1920, chap. 447, § 1, as amd. by Laws of 1922, chap. 544; Laws of 1925, chap. 267.)

A similar provision was enacted in the Nassau County Charter (Laws of 1923, chap. 863, § 380), but the statute was not adopted on referendum to the voters. (See Laws of 1923, chap. 863, § 884, as amd. by Laws of 1925, chap. 546; Tables of Laws in Session Laws of 1926, p. 1763.)

City planning boards are authorized and required to have two officials of the municipality as members. (General City Law, § 27, added by Laws of 1926, chap. 690, as amd. by Laws of 1929, chap. 605.) Similar provisions are found in the Village Law (Village Law, § 179-f, added by Laws of 1926, chap. 719, as amd. by Laws of 1929, chap. 60) and under section 239-b *et seq.* of

---

* Added by Laws of 1913, chap. 699, as amd. by Laws of 1920, chap. 377.—[REP.

the General Municipal Law (added by Laws of 1925, chap. 539, as amd. by Laws of 1927, chap. 314, and Laws of 1932, chap. 137) and in sections 239-e and 239-f of the General Municipal Law (added by Laws of 1929, chap. 615, as amd. by Laws of 1932, chap. 137), whereby the State has authorized the establishment of " Regional Planning Boards," now known as " Regional or County Planning Boards," to consist of representatives of counties, cities, towns and villages.

If any public policy has been formed, it is that elected representatives holding municipal offices are not disqualified from membership on a planning board merely because it might seem that the two offices are incompatible.

The test of incompatibility " is, whether the two offices are incompatible in their natures, in the rights, duties, or obligations connected with or flowing out of them." (*State ex rel. Clawson* v. *Thompson*, 20 N. J. Law, 689.)

Examples of incompatibility are found in the offices of school district trustee and deputy county auditor (*Wells* v. *State ex rel. Peden*, 175 Ind. 380; 94 N. E. 321); constable and marshal (*State ex rel. Banker* v. *Bobst*, 205 Iowa, 608; 218 N. W. 253); municipal board of health and quarantine physician (*Gaw* v. *Ashley*, 195 Mass. 173); town selectman and superintendent of streets (*Attorney-General* v. *Henry*, 262 Mass. 127; 159 N. E. 539); board of supervisors and drain commissioner (*Kinyon* v. *Duchene*, 21 Mich. 498); school district treasurer and county commissioner (*State ex rel. Hilton* v. *Sword*, 157 Minn. 263; 196 N. W. 467); prosecutor of pleas and Attorney-General (*State ex rel. Clawson* v. *Thompson*, 20 N. J. Law, 689); mayor and governor (*Attorney-General ex rel. Moreland* v. *Detroit Common Council*, 112 Mich. 145).

All these illustrations seem to me to be clearly distinguishable from the relationship of supervisor and planning board member.

Applying the tests stated, I see no " inconsistency in the functions of the two " (*State ex rel., etc.*, v. *Wait*, 92 Neb. 313, 323; 138 N. W. 159, 163).

The members of the planning commission received no salary. As members of the board of supervisors, they audited their own accounts as members of the planning board. " Members of boards of supervisors and town auditors pass upon their own accounts. No fault has ever been found with this, for the necessity of the case has demanded that it be so." (*Matter of Ryers*, 72 N. Y. 1, 15.)

Appellants also claim that the board of supervisors ignored the State aid which a county may receive for construction of roads under the county road system, and that the improvements contemplated could not be paid for out of the proceeds of bonds or by

taxation, but only out of the " County Road (State Aid) Fund." They contend that the resolution providing that the funded debt be created *solely* (italics mine) to build the bridges was beyond the power of the supervisors, because the roads were county roads and the statute requires county roads to be built with funds from the county road fund (formerly known as State aid fund), and because county road bridges must be built out of a particular fund it was unlawful to use any other fund.

The resolutions adopted by the board of supervisors provided that three roads, known respectively as North Haven-Shelter Island road, Shelter Island road, and Suffolk boulevard, be added " to the list of roads in Suffolk County designated for construction with moneys from the State Aid Fund," and they declared the three proposed bridge projects " to be public purposes and public and county purposes " and that an issue of $3,350,000 of bonds be provided for the payment of the three bridges. A similar resolution allocated $950,000 for dredging in various parts of the county. On April 27, 1931, they resolved to raise $3,000,000 by issuing bonds to be designated " County Road Bonds, Series of 1931," to be used for two roads and bridges and similar resolutions were adopted providing for $350,000 county road bonds, $550,000 parkway bonds, $100,000 hospital bonds and $1,000,000 dredging bonds.

As I know of no law which in effect says the use of State funds is excluded when the resolution of the supervisors provides that the funded debt shall be created *solely* to build bridges, I cannot subscribe to appellants' contention. As I interpret the resolutions, the moneys from the sale of bonds shall be used for no other purpose than the one designated. It does not mean that no other funds than bond moneys shall be used.

The definition of the term " County Road Fund " is found in subdivisions 1 and 5 of section 320-b of the Highway Law (added by Laws of 1929, chap. 362, as amd. by Laws of 1930, chap. 770). It is there provided that " The State moneys, together with the amount provided by the county under subdivision two of this section, * * * shall become a common fund for the purposes of this section and such money shall be expended as provided herein for the construction * * * of a county road system," and the money shall be deposited in a fund known as " county road fund."

The county superintendent of highways recommended and the State Superintendent of Public Works approved the construction of the bridges as " county road improvements."

Payment for a county road shall be made by the county treasurer from the county road fund (Highway Law, § 320-b, subd. 10, as amd. by Laws of 1930, chap. 770), and any bridge located on a

county road system, constructed with county road fund moneys, shall be deemed a part of the road on which it is located. (Highway Law, § 320-b, subd. 13, as amd. by Laws of 1930, chap. 770.)

A complete answer is found to appellants' contention that the supervisors had no right to waive the State aid and provide that the entire cost be imposed solely upon the county, in subdivision 2 section 320-b of the Highway Law (as amd. by Laws of 1930, chap. 770). Under that subdivision, the supervisors, in lieu of constructing a highway under section 320 or 320-a, "or under the general or special law governing the construction or improvement of highways, other than county highways, * * * may appropriate and contribute to the county road fund an amount to be applied to the construction * * * of such highway * * *. Such moneys may be raised by the county by tax or county obligations in the manner," etc.

Under the above-quoted subdivision, the board of supervisors had authority to appropriate funds to be applied to the expense of the proposed improvements and to raise such funds by " county obligations."

I have found no law against raising such funds to be used in common with the funds provided by the State for road construction purposes.

The term " State aid fund " was superseded in 1930 by " county road fund." (Highway Law, § 320-b, subd. 1, as amd. by Laws of 1930, chap. 770.) Thus the Legislature recognized the fund as a county fund to which the State contributes, rather than a State fund to which the county contributes, and there is no limitation of the amount the county may contribute.

Not only was the approval of the State Highway Department obtained for the proposed road and bridge construction, but the consent of the War Department also.

I conclude that the board of supervisors did not waive the State aid. On the contrary, they seem to have done everything possible to obtain and use the funds contributed by the State.

I see no distinction in this case between the right to build the roads and the right to build the bridges. " A power to construct and maintain a highway may by fair intendment include the right to build bridges as part of the highway." (*Robia Holding Corp.* v. *Walker*, 257 N. Y. 431, 438.)

Although the Highway Law provides that a lawfully constructed bridge shall be deemed a part of the highway (§ 250-a, added by Laws of 1924, chap. 276, as amd. by Laws of 1927, chap. 293), there is no definition of what is a lawfully constructed bridge. One that impedes navigation may not be lawful. (County Law, art. 5; Penal

Law, § 1505.) Any argument founded upon the premise that a bridge cannot be built because there is no statutory definition of what is a " lawfully constructed bridge " or upon the fact of interruption to navigation, is defeated by the provisions of sections 61 to 69 of the County Law, as amended. These sections recognize the right to erect bridges over navigable tide waters and also the right of the United States government to compel removal when necessary as an obstruction to navigation. Provision is also made for approval of plans of any new bridge by the United States authorities, and such approval was obtained.

The proposed bridges seem to be lawful in so far as Federal law is concerned. Section 9 of the United States Rivers and Harbors Act of 1899 (30 U. S. Stat. at Large, 1151, chap. 425; U. S. Code, tit. 33, § 401) provides for the construction of bridges over navigable waters without the consent of Congress when the waterways in question are " wholly within the limits of a single State " and the plans are approved by the War Department. The bridges in question will span navigable waters lying wholly within this State.

The proposal to bridge navigable waters cannot be defeated merely because the bridges may interfere in some degree with the full flow of the tidal waters. Courts have recognized the fact that a bridge may to some extent impede the flow of water (*Clement* v. *Metropolitan West Side El. R. Co.*, 123 Fed. 271; *People ex rel. Lehigh Valley R. Co.* v. *State Tax Commission*, 247 N. Y. 9, 12, 13), but the control over plans and construction exercised by the War Department and the State should not be overlooked. The approval by the government " is conclusive that the bridge is a lawful structure, although it interferes with navigation." (*United States* v. *Norfolk-Berkley Bridge Corporation*, 29 F. [2d] 115, 125.) The authority of the State over waters entirely within the State " is plenary, subject only to such action as Congress may take in execution of its power under the Constitution to regulate commerce among the several States." (*Cummings* v. *Chicago*, 188. U. S. 410, 427.) Direct legislation by Congress in each case of bridge construction is not required. Congress has " charged the Secretary of War with the duty of ascertaining * * * whether the particular bridge came within the general rule prescribed * * *. Congress intended by its legislation to give the same force and effect to the decision of the Secretary of War that would have been accorded to direct action by it on the subject." (*Monongahela Bridge* v. *United States*, 216 U. S. 177, 192, 193, 195.)

*White, Gratwick & Mitchell, Inc.*, v. *Empire E. Co., Inc.* (125 Misc. 47; affd., 211 App. Div. 834; affd., 240 N. Y. 648; appeal dismissed, 271 U. S. 641), relied upon by the appellants to the con-

trary, is not applicable. In that case defendant obtained a land grant from the Land Office Commissioners of this State of land under the water of the Niagara river. By constructing a proposed pier they would bar access to plaintiff's property. The Secretary of War had not approved defendant's proposal. The decision was against defendant's argument that establishment by the War Department of a harbor line at a certain point authorized them to construct the proposed pier out to the line so established. The referee's conclusion, which was affirmed, was that, until consent of the proper Federal authorities shall be obtained, " the plaintiff may maintain this action to restrain interference in the navigability of the river as means of access to its property." (125 Misc. at p. 61.)

Appellants' contention that the resolutions providing for dredging are void cannot be sustained. Under subdivision 51-a of section 12 of the County Law (as added by Laws of 1931, chap. 401) the board of supervisors of Nassau and Suffolk counties were authorized to provide for dredging at the expense of the county, and they " may appropriate moneys available for general town improvements *in aid of Federal or State projects for such purposes.*" (Italics mine.) They also " may issue bonds to provide moneys to pay the costs of the improvements."

The supervisors complied with the law in their resolution of April 27, 1931, as amended by resolution of May 25, 1931, in which they specifically referred to chapter 401 of the Laws of 1931 (adding to County Law, § 12, subd. 51-a). Assuming, however, that no Federal or State aid was contemplated, the statute may be read as granting authority to the county of Suffolk to proceed with the work at its own expense and the money therefor may be raised by issuing bonds. In so holding, we do not intend to bar the board of supervisors from co-operating with the Federal government.

We have no concern with the propriety of the general policy adopted by the board of supervisors, and our decision is not made upon any question of public policy. Such difference of opinion as may exist among the residents and taxpayers of Suffolk county as to public policy has not been considered by us in this case.

I conclude that the judgment dismissing the complaint should be affirmed, with one bill of costs to all defendants except defendant Homan, who filed no brief on this appeal.

Present — LAZANSKY, P. J., HAGARTY, CARSWELL, SCUDDER and DAVIS, JJ.

Judgment unanimously affirmed, with one bill of costs to all respondents filing briefs.